## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

BALTIMORE AND OHIO RAILROAD COMPANY v. ELWOOD D. PATTERSON.

BALTIMORE AND OHIO RAILROAD COMPANY v. CITY OF WINCHESTER, VIRGINIA.

BALTIMORE AND OHIO RAILROAD COMPANY v. KATHERINE MONTAGUE COOPER.

January 14, 1963.

Record Nos. 5519, 5520, 5521.

Present, All the Justices.

The opinion states the case.

*W. W. Wharton; James R. Sipe* (*Wharton, Aldhizer & Weaver*, on brief), for plaintiff in error, Baltimore and Ohio Railroad Company, Record No. 5519.

*Burr P. Harrison; J. Randolph Larrick* (*William A. Johnston, III; Largent, Anderson & Larrick; Harrison & Johnston*, on brief), for defendant in error, Elwood D. Patterson, Record No. 5519.

(*W. W. Wharton; James R. Sipe*, for plaintiff in error, Baltimore and Ohio Railroad Company.) Record Nos. 5520, 5521.

(*J. Randolph Larrick*, for defendant in error, City of Winchester, Virginia.) Record No. 5520.

(*William A. Johnston, III*, for defendant in error, Katherine Montague Cooper.) Record No. 5521.

Record Nos. 5520, 5521 controlled by Record No. 5519.
Nos. 5520, 5521—no record printed; no printed briefs filed and not argued orally.

SPRATLEY, J., delivered the opinion of the court.

Elwood D. Patterson, the city of Winchester, Virginia, and Katherine Montague Cooper instituted separate actions against the Baltimore and Ohio Railroad Company for damages to their respective properties, resulting from a derailment of the defendant's freight cars. By agreement of all parties, the evidence in each case being identical, the cases were consolidated for trial. Upon the conclusion of the evidence for the plaintiffs, and at the completion of all the evidence, the defendant railroad company moved to strike the plaintiffs' evidence on the ground that it failed to disclose any negligence on its part or to show foreseeability of the derailment of its cars. In each instance, the motion was overruled. Verdicts were rendered in favor of the plaintiffs. A motion to set the verdicts aside as contrary to the law and the evidence, and without evidence to support them, was overruled. The quantum of damages being stipulated, judgments were accordingly entered against defendant in each case.

We granted a writ of error in each case, and upon joint motion of all parties, the record in the Patterson case only was directed to be printed. By further agreement, an order was entered that the judgment of this Court in the Patterson case should be controlling in each of the other cases.

The case was submitted to the jury solely on the question whether the derailment of the cars was due to the negligence of the defendant in the operation of its train. It was heard on a stipulation of facts, several affidavits, some oral testimony and photographic views showing the railroad tracks, a train and freight cars on the tracks, the railroad switch, and the area involved.

The stipulation contained the following facts:

"On the 10th day of August, 1957, at about 3.25 p. m., the defendant's Diesel engine, followed by a caboose and 51 cars was moving southward from a point north of the Winchester station in Winchester, Virginia. At a point approximately 100 yards from the Winchester terminal, defendant's brakeman aligned a switch for a crossover movement from the yard track to the main track. The brakeman did not lock the switch in position but did insert the S-shaped keeper. The switch is equipped so it can be locked only in the closed position, thereby guarding it against an unintentional crossover movement from a yard track to the main track. When the switch is open for a crossover movement, it is equipped so that it cannot be locked in that position but can be temporarily secured in that position by a metal hook known as an S-shaped keeper.

"A stop was made at the freight station for approximately two minutes. While thus stopped, the Diesel, caboose, and eight cars were standing on the main track with the ninth car straddling the switch at the crossover. The remainder of the train which followed the ninth car was standing on the yard track.

"The switch was equipped with a pendulum bar with a ball or weight at the end thereof weighing 30 pounds. In order to effect a change in the switched position, it is necessary that the pendulum bar be swung from the left-hand horizontal rest position up and over to the right-hand horizontal rest position. In each rest position the switch is equipped with a foot-operated pedal latch which must be depressed in order to release the pendulum bar so that its position can be changed. The latch on each rest position is equipped so that a lock or keeper can be inserted to prevent opening of the latch. At all times herein mentioned, this switch was equipped with a padlock on a chain which would reach only the latched position used for straight-ahead movement on the yard track. The switch was equipped with an S-shaped keeper on a chain which would reach the latches on both rest positions.

"As the engine and first nine cars proceeded across the switch, the pendulum bar was latched in the rest position for a crossover movement and the S-shaped keeper was inserted in that latch.

"Unknown to any of the train crew, all of whom were on the front end of the train and out of sight of the switch around a curve, a young boy aged five years and eleven months who lived on the east side of the track at a point almost opposite the switch, came on the right-of-way and threw the switch. The engine moved southward away from the station and across Picadilly Street on the main track.

After the train had proceeded about ten car-lengths at a speed of about five to six miles per hour or less, the engineer noticed that the train was dragging. He shut off the engine and stopped the train and discovered that certain cars of the train were derailed at and near the Picadilly Street crossing because of the thrown switch, and part of the rear portion of the train had continued up the yard track.

"The railroad right-of-way in the vicinity of the switch is bordered by the back yards of residential property on the eastern side and by business property on the western side. On the eastern or residential side, the right-of-way is fenced for approximately 90 feet both north and south of the switch, as shown on the photographs in evidence."

The location of the switch is north of the railroad company's station and two street crossings, one crossing immediately to the north of the station, and the other, Picadilly street, south of the station.

Affidavits presented by the plaintiffs were to the effect that the railroad right-of-way had been used as a walkway by numerous persons and that children had been seen frequently playing on or about the railway tracks.

Affidavits on behalf of the defendant averred that no pedestrians had been constantly or frequently seen on the right-of-way, nor children walking or playing thereon.

There is no evidence that on the day in question any children were seen at or near the point of the switch, or on the right-of-way of the defendant.

Witnesses on behalf of the railroad company testified, without contradiction, that the switch was of a standard type in use for more than forty years throughout the entire system of the company; that it had been at the same location, equipped with the same devices, and had been daily operated in the same manner for forty years as on the day of the accident; and that this was the only time this switch, or any of its switches, had been tampered with by an unauthorized person.

Plaintiffs contend that they made out a *prima facie* case of negligence when they showed that the train, operated under the full and exclusive control of the defendant, left its rails, ran off its right-of-way and into a busy thoroughfare. They claim that defendant's agents were guilty of negligence in failing to see that the switch had been thrown before the train moved from the railway station; in failing to see the switch being thrown; and in failing to foresee the probability of injury from leaving the switch unguarded at a point

on its premises which the defendant had permitted the public to use.

Defendant denied negligence in any particular, and the case was tried solely on the issue of negligence as the proximate cause of the damages complained of.

In 38 Am. Jur., Negligence, § 24, pages 667, 671, this is said:

"Negligence must be determined upon the facts as they appeared at the time, and not by a judgment from actual consequences which were not then to be apprehended by a prudent and competent man. * * * If men were held answerable for everything they did which was dangerous in fact, they would be held for all their acts from which harm in fact ensued. Accordingly, in order to impute knowledge of a dangerous thing or place, the danger therefrom must have been such as is recognized by common experience or by the special experience of the actor, or such as might reasonably have been expected by a person of ordinary prudence and of ordinary foresight."

In *Hair* v. *City of Lynchburg*, 165 Va. 78, 181 S. E. 285, we said:

"It is fundamental that one is not responsible for consequences which are merely possible, but only for those which are probable according to ordinary and usual experience. 165 Va., *supra*, page 83.

" '* * * (I)t has been held in many cases that a wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. The natural and probable consequences are those which human foresight can foresee, because they happen so frequently that they may be expected to happen again. The possible consequences are those which happen so infrequently that they are not expected to happen again. A man's responsibility for his negligence must end somewhere. As has been well said: "One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable." ' " 165 Va., *supra*, page 84. See also *Wyatt* v. *Telephone Co.*, 158 Va. 470, 479, 163 S. E. 370, 373.

"The general rule seems to be that the fact that the person responsible for the intervening act is a child does not affect the case, but, if the act itself is an intervening, independent, efficient cause which is neither foreseen nor reasonably foreseeable by the defendant, it will break the causal connection between the defendant's negligence

and the plaintiff's injury, even though it is the act of an irresponsible child." 38 Am. Jur., Negligence, § 74, page 732.

With even stronger reason the rule applies when the defendant has not been guilty of prior negligence.

Briefly stated, the evidence shows that the brakeman of the train duly performed his duty in throwing the switch, and locking it in proper position with the "S-shaped keeper," so that the train might pass from the side or yard track to the main line track. The train started over the switch and its front portion, the engine, caboose and eight cars passed safely to the main track. The train was then stopped for about two minutes, and while stopped, with the ninth car straddling the switch in the crossover, and the remaining cars standing on the side track, the young boy came on the right-of-way and reversed the switch, so that it was closed to entry from the side track to the main track. Almost immediately thereafter, the train started again, with its crew on its front part, and proceeded about ten-car lengths when the engineer felt "something pulling hard," and he stopped the engine. It was then discovered that some of the cars were derailed.

The photographs show that the rear wheels of the ninth car, the car astride the switch, left the rails and moved forward in that condition. The rear cars of the train continued forward on the side track, and later crossed over the main line track and across the right-of-way of the railroad into a public street. There the derailed railroad cars damaged an automobile owned by Patterson, street fixtures owned by the city of Winchester, and a building owned by Katherine Montague Cooper.

There is no evidence indicating that any employee of the railroad company had an opportunity within the two minutes the train stopped to discover or anticipate that the switch had been tampered with. No one had tampered with the switch of the company for four decades.

Here, in order for the switch to be changed, it was necessary for the "safety keeper" to be removed; the foot-operated pedal latch to be depressed, in order to release the pendulum bar; and the pendulum bar, with a ball or weight at its end weighing 30 pounds, to be swung from one rest position up and over to another rest position.

The employees of the railroad company having put the switch in a proper position for the train to pass to the main line, and having seen the first part of the train pass safely over the switch, had the right to assume, and did assume, that it had not been changed since

the train had started forward. If more duty was required than seeing that the switch was in proper position, and that a portion of the train passed safely over the switch, then it would be necessary for a railroad to station employees at or near a switch so long as it might be in use, a duty not required in the absence of notice of a dangerous situation.

Had it not been for the independent act of the five-year, eleven-month old child by which the switch was turned and the continuity of the rails broken, the accident would not have happened. The act of the boy was in violation of the law. Virginia Code, § 18-205. It was a trespass upon the property and rights of the railroad company. It is difficult to see how the railroad company, under the circumstances here, could have foreseen or reasonably anticipated that the young boy could, or would, undertake to operate the particular type of switch here involved. There was nothing in its former experience, observation, or information to lead it to such anticipation.

We are of opinion that the evidence fails to show that defendant was guilty of any negligence, either in the operation of its train or in failing to anticipate the act of the child. Irrespective of the question of the young child's responsibility for his act, his independent act was the efficient and sole proximate cause of the derailment of the cars and the consequential damages to plaintiffs. There is no basis for the claim that the act of the child could have been more foreseeable than a like act by an adult. Cf. *Cole v. German Savings & Loan Society*, 124 F. (8th Cir.) 113; *Martino v. Rotondi*, 91 W. Va. 482, 113 S. E. 760, 36 A. L. R. 6. The trial court should have sustained the motion of the defendant to strike the evidence of plaintiffs.

Having reached this conclusion, we need not consider whether the defendant was guilty of trespass, a theory not raised until after the verdict of the jury. There is no actual wrong of trespass, unless one breaches a duty which rests upon him. Here, the evidence sufficiently explained why the railroad company was not responsible for what occurred.

Cases relied on by the plaintiffs to support a contrary view do not involve the precise question here before us, and may be distinguished on the particular facts and the rules of law prevailing in the several jurisdictions.

For the reasons stated, the judgment in each case will be reversed, the verdict set aside, and final judgment here entered for the defendant, Baltimore and Ohio Railroad Company, in each case.

*Reversed and final judgment.*