STATE OF NORTH CAROLINA v. ALBERT LEE LANE

No. 355A88

(Filed 2 May 1991)

1. **Homicide § 21.6 (NCI3d) — murder — aiding and abetting armed robbery — evidence sufficient**

    The evidence taken as a whole was sufficient for the jury to find that defendant aided and abetted his brother in the commission of an armed robbery and that the homicide occurred during the commission of the armed robbery where the jury could reasonably infer from the evidence that defendant and his brother drove around to several convenience stores looking for a store to rob; the Handy Mart was chosen since it was near closing time when they arrived and there were few customers; the motive was to secure funds for defendant and his family; defendant served as a lookout for his brother; automotive fuses were left on the counter because defendant could not pay for them at that time; defendant left the scene of the crime and failed to communicate with the police or emergency personnel in order to avoid being charged; defendant was upset and threatened suicide because of his participation; and defendant parted with his black powder pistol only for the purpose of its use by his brother if necessary to complete the robbery or dispose of witnesses.

    **Am Jur 2d, Criminal Law § 167; Homicide §§ 28, 72, 263 et seq.**

2. **Homicide § 21.5 (NCI3d) — murder — premeditation and deliberation — evidence sufficient**

    The trial court did not err by denying defendant's motion to dismiss the charge of murder in the first degree based on malice, premeditation and deliberation where the circumstantial evidence, taken as a whole, was sufficient to permit the jury to reasonably infer that defendant's brother murdered the victim with premeditation and deliberation and that defendant aided and abetted his brother in the commission of the crime.

    **Am Jur 2d, Criminal Law § 167; Homicide §§ 28, 72, 263 et seq.**

STATE v. LANE

[328 N.C. 598 (1991)]

3. **Searches and Seizures § 13 (NCI3d) — weapon and ammunition voluntarily given officer — officer's refusal to return — not search and seizure**

The trial court did not err in a murder prosecution by failing to suppress defendant's pistol, ammunition, and the results of testing done on them where defendant voluntarily unloaded the pistol and handed it and the ammunition to a police officer. Although defendant contends that the search and seizure occurred later, either when the officer turned the pistol and ammunition over to another officer, or when he declined to return it to defendant, the pistol and ammunition were already lawfully in the possession of the police officer and he was therefore not required to return it to the owner if there was probable cause to retain it. The facts before the officer in this case were sufficient to cause a person of reasonable caution to believe that the black powder pistol and ammunition might be useful as evidence of the murder of the victim.

**Am Jur 2d, Searches and Seizures §§ 1 et seq.**

4. **Searches and Seizures § 4 (NCI3d) — black powder pistol — forensic testing — no constitutional violation**

The trial court did not err in a homicide prosecution by failing to suppress the forensic testing on defendant's black powder pistol and ammunition. There is no constitutional violation in admitting tests performed on items lawfully seized without a warrant.

**Am Jur 2d, Evidence § 818; Searches and Seizures § 105.**

5. **Criminal Law §§ 794, 796 (NCI4th) — homicide — instruction on acting in concert and aiding and abetting — no plain error**

There was no plain error in a murder prosecution from the court's instruction on acting in concert and aiding or abetting where the evidence, viewed as a whole, was sufficient to permit the jury to infer that defendant and his brother acted together with a common purpose to commit at least the robbery, and that defendant aided and abetted his brother in the crime of first degree murder based on the felony murder rule. Even assuming error, the Supreme Court was not convinced that the jury would have reached another verdict absent the error.

**Am Jur 2d, Criminal Law § 167; Homicide §§ 28, 72.**

STATE v. LANE

[328 N.C. 598 (1991)]

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of life imprisonment entered by *Wright, J.,* at the 21 April 1988 Criminal Session of Superior Court, WAYNE County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 14 May 1990.

*Lacy H. Thornburg, Attorney General,* by *Steven F. Bryant, Special Deputy Attorney General,* for the State.

*Malcolm Ray Hunter, Jr., Appellate Defender,* by *Staples Hughes, Assistant Appellate Defender,* for defendant.

FRYE, Justice.

Defendant contends that the trial court committed three errors in his trial. First, defendant argues that the trial court erred in denying his motion to dismiss, contending that there was insufficient evidence to submit the case to the jury. Second, defendant contends that the trial court erred in denying his motion to suppress his pistol, ammunition, and the results of testing which established that defendant's pistol was the murder weapon; and third, defendant contends that the trial court's instructions to the jury on acting in concert and aiding and abetting allowed him to be convicted on theories unsupported by the evidence. We find no reversible error.

In a proper indictment, defendant was charged with the murder of Virginia Aileen Smith. The case was tried as a noncapital case, and defendant was convicted of first degree murder and sentenced to life imprisonment. The victim, an employee of a Handy Mart convenience store located on Highway 117 about three miles north of Mount Olive in Wayne County, was killed around 11:00 p.m. on 5 July 1987 while working at the store.

During trial, the State's evidence included testimony from three people who were at the Handy Mart around 10:50 to 10:55 on the evening of 5 July 1987. The State also presented testimony from three other people who arrived at the scene shortly after the murder and testimony from some of the officers who were called to the Handy Mart to investigate the murder. None of the State's witnesses were present when the robbery and homicide occurred. Several photographs were used at trial. Some of the photographs were of defendant's automobile, an Oldsmobile Cutlass,

STATE v. LANE

[328 N.C. 598 (1991)]

and others were photographs of defendant's brother, Gordon Lane's automobile, an American Motors Hornet.

George Grady testified that he stopped at the Handy Mart about 10:50 p.m. on 5 July 1987 and went inside to make a purchase. When Grady drove up to the store, the victim was outside reading the day's totals from the gas pumps. The store normally closed at 11 p.m. Grady made his purchases, and as he left, a woman entered the store. This woman was identified as Doris Bryant who also testified at trial. Grady further testified that as he was driving out of the parking lot, he saw a "brownish-burgundy" or "burgundy-reddish" two-door automobile drive into the parking lot. Grady was not sure if the automobile was a Monte Carlo or a Cutlass, and he could not identify the man who got out of this automobile.

Ms. Bryant testified that she arrived at the Handy Mart about 10:50 on the evening of 5 July 1987. Ms. Bryant and her grand-daughter, Jaquetta Stringfield, who also testified at trial, had come to the Handy Mart to purchase some soft drinks. Ms. Bryant testified that she did not recall seeing Mr. Grady at the store while she was there, but she did see a white male of medium height and build standing near a "brownish" automobile parked near the dump-ster at the store. She testified that while she was inside the store, this man came into the store, turned around, and walked out. When she left the store some five minutes after she arrived, the man was again standing beside his automobile. Ms. Bryant testified that she did not see anyone else in the automobile with the man. This man got into his automobile, and as Ms. Bryant was leaving the parking lot, this man's automobile pulled out behind her and followed her until she reached Betty's Drugs which is approximate-ly a five-minute drive from the Handy Mart. At that time, the man turned left and stopped following her automobile.

Ms. Stringfield, Ms. Bryant's granddaughter who was fifteen years old at the time of the incident, testified that she sat in her grandmother's automobile while her grandmother went into the Handy Mart on the evening of 5 July 1987. Ms. Stringfield testified that while her grandmother was in the Handy Mart, a white male went into the store and turned around and walked out. She also testified that she was able to observe that man as he was walking to his automobile because he passed within five or six feet of her automobile. After a voir dire hearing, Ms. Stringfield was allowed to testify that defendant was the man she saw walk

into the store, leave the store, and pass by her grandmother's automobile as he was walking back to his own automobile which Ms. Stringfield described as a "sort of tannish brown" two-door, medium-sized automobile. Ms. Stringfield also testified that this man got into the automobile and, with his bright lights on, followed her grandmother's automobile down the highway before turning at Betty's Drugs. Ms. Stringfield testified that she had picked defendant's photograph out of an array which was shown to her, but she was unable to identify two other photographs of defendant shown to her at another time.

Harry Simmons testified that he and his sister, Shirley Bowden, drove past the Handy Mart about 11:05 p.m. that evening and noticed a body on the pavement between the gas pumps and saw smoke lingering under the canopy over the gas pumps. At the time they drove by, an automobile pulled out of the Handy Mart parking lot. Mr. Simmons described this automobile as a small, two-door, two-toned tan American Motors Ambassador or Hornet. Mr. Simmons and his sister, who was driving, followed the automobile and tried to get close enough to get its license number. They were unable to get the license number because the tag was dirty. Ms. Bowden also testified at trial and gave a similar description of the automobile to that which her brother had given. Ms. Bowden identified State's exhibit number 2, a photograph of Gordon Lane's automobile, as similar to the automobile she had seen pull out of the Handy Mart parking lot.

Mr. Simmons and Ms. Bowden both testified that they only saw one person in the automobile they were following. Both testified that the driver, the only person they saw in the automobile, had long hair which fell at least to his neck. At trial, Ms. Bowden, after observing that defendant had a bald spot on the back of his head, testified that she did not see anything like a bald spot on the back of the driver's head.

Kevin Lane testified that he and his brother drove past the Handy Mart about 11:06 on the evening of 5 July 1987 and that they pulled into the parking lot and discovered the victim on the pavement. At that time, the victim was alive but unconscious. Mr. Lane called the police, and the police and rescue personnel arrived within a few minutes of his call.

Deputy Billy Anderson, who participated in the investigation at the Handy Mart, gave testimony about that investigation and

also testified that he and Sergeant Brogden answered a call on 26 July 1987 concerning a possible suicide threat. The two officers went into the house to talk with the individual who was allegedly threatening suicide, and Anderson watched as Brogden talked to the individual who was identified as defendant. Defendant, who was armed with a black powder pistol, gave the pistol to Brogden. This pistol was later identified as the murder weapon. Other testimony revealed that defendant had purchased the pistol during the week preceding 5 July 1987.

Further testimony showed that officers went to defendant's place of work on 30 July 1987 and asked him to come to the Sheriff's Department to answer some questions. Defendant went with the officers and made a statement in which he said that he had gone to the Handy Mart earlier in the evening of 5 July 1987 with a friend and had then driven to Nancy Anderson's house about 8:00 p.m. and remained there until the next morning.

Defendant was arrested on 31 July 1987 and gave the officers a second statement after his arrest. In this statement, defendant said that he was driving around alone and stopped in the Handy Mart to buy a drink. He said that he asked about a fuse because the taillights on his automobile were out, but he did not buy any fuses because he could not decide which kind he needed. Defendant then said that he left and went to another convenience store to play some arcade games.

Defendant made a third statement in which he claimed that he had given the black powder pistol to Charles Berkley, his half brother, and told him to put it under the driver's seat in defendant's automobile when he finished with the gun. Defendant, according to this statement, did not see the gun again until 6 July when he took it from under the seat of his automobile where he had told his half brother to put it.

The State also presented testimony to the effect that when the officers arrived at the Handy Mart the drawer beneath the cash register was open and no money was found in the drawer. On the counter was a box of fuses with one missing, and one fuse was on the counter. The manager of the Handy Mart testified that after examining the cash register tapes and considering normal operating procedures, she estimated about $280 was taken from the store on the evening of 5 July 1987.

At the close of the State's evidence, defendant's motion for nonsuit was denied. Defendant then testified in his own behalf at trial. During his testimony, defendant stated that he bought the pistol because he believed that it was an antique and because he collected knives and firearms. Defendant further testified that his brother Gordon had been present when he purchased the pistol and that his brother had fired the pistol. According to defendant, he spent much of the day on 5 July 1987 with his girlfriend Nancy Anderson and her son. He drove them home around 8:30 p.m. and drove back to his home, attempting to get home before it got dark because of the problems he had with his taillights. Defendant had trouble with his taillights shorting out, and he often had to put new fuses in the automobile. When he got home, defendant ate some doughnuts and started drinking beer. He drank two or three beers before he left the trailer with his brother Gordon later that evening. Defendant and his brother Gordon decided to go out to play video games, and they left together with Gordon driving his automobile, the American Motors Hornet. Defendant testified that he did not feel well when he left with Gordon because he had eaten the doughnuts and drunk the beer. The two brothers went to some places in Goldsboro to play video games and then drove to Mount Olive. They stopped at a convenience store in Mount Olive to play video games, but around 10:45 p.m. the manager told them it was time to leave because the store was closing. Defendant testified that he continued to drink beer during the evening and that Gordon continued to drive the entire evening.

Defendant testified that as they were on their way back to Goldsboro, Gordon said that he wanted to stop at the Handy Mart to talk with someone. They both went into the store, and defendant asked if they had any fuses. He brought a box to the counter and took one fuse out and set the box on the counter. While he was doing this, Gordon was talking to the cashier who was counting some money. After asking Gordon if these fuses were the right kind to go into defendant's automobile and finding out that they would not fit, defendant testified that he left the store and went back to the automobile. Gordon remained in the store. Defendant testified that he was feeling nauseated and that he sat down in the automobile, shut the door, and put his head between his legs because his head was spinning. He then vomited. While he was doing this, he heard his brother and the cashier "fussing." Defendant put his head back down between his knees, and he then heard

a shot. When he looked up, his brother was standing over the victim with the black powder pistol in his hand. Gordon got into the automobile and drove off so quickly that defendant was thrown to the floor of the automobile where he remained. Gordon told defendant that it was an accident and that he did not mean to do it. Defendant testified that as they drove back home, Gordon said that he would hurt defendant's family and defendant's girlfriend and her family if he said anything to anyone about what had happened. Defendant testified that he had lied in the statements he made to the officer because he was afraid of Gordon and wanted to protect his loved ones. Defendant also testified that he did not see his pistol again until the day he contemplated suicide, and on that day, 26 July 1987, he got the pistol out of Gordon's automobile.

Defendant presented evidence that his brother Gordon had been seen with the pistol in his possession some time after the murder on 5 July 1987 but before the pistol was taken from defendant on 26 July 1987. Salina Grim testified that Gordon had the pistol in his automobile when he came to her mother's residence and that he had taken the pistol out of the automobile, pointed it at her dog's head, and threatened to kill the dog.

Defendant's sister, Sheila Lane, testified that after court one day while the trial was proceeding, Gordon, who still lived with Sheila and their mother, admitted that he, not defendant, had killed the victim. Gordon, who had previously attended the trial daily, then disappeared although he had been subpoenaed to testify for his brother.[1] Gordon's mother testified that she had also heard Gordon admit that he had killed the victim.

The case was submitted to the jury for possible verdicts of guilty of first degree murder based on malice, premeditation and deliberation and under the felony murder rule, second degree murder, or not guilty. The jury returned a verdict of guilty of first degree murder on the basis of malice, premeditation and deliberation and on the basis of the felony murder rule. From a sentence of life imprisonment, defendant appeals contending that the evidence was insufficient to carry the case to the jury.

---

1. The record shows that on 22 April 1988, the day after defendant was convicted, a warrant was issued for Gordon Lane, defendant's brother, charging him with first degree murder in the death of Virginia Smith. Gordon Lane was indicted on 13 June 1988. On 15 August 1988, he pled no contest to second degree murder and was sentenced to fifteen years in prison.

STATE v. LANE

[328 N.C. 598 (1991)]

[1] After the denial of his motion to dismiss at the close of the State's evidence, defendant proceeded to offer evidence, thereby waiving his motion to dismiss at the close of the State's evidence. *State v. Saunders,* 317 N.C. 308, 347 S.E.2d 212 (1986); *State v. Leonard,* 300 N.C. 223, 266 S.E.2d 631 (1980). We, therefore, consider only defendant's motion to dismiss made at the close of all the evidence. *Id.*

"[T]o overcome a motion for nonsuit and justify a conviction of the defendant, the State must offer evidence from which it can be reasonably inferred (1) that deceased died by virtue of a criminal act, and (2) that the act was committed by the defendant." *State v. Lee,* 294 N.C. 299, 302, 240 S.E.2d 449, 451 (1978) (citations omitted). The motion is not properly denied unless there is substantial evidence of all material elements of the crime. *State v. Furr,* 292 N.C. 711, 715, 235 S.E.2d 193, 196, *cert. denied,* 434 U.S. 924, 54 L. Ed. 2d 281 (1977) (citations omitted). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State v. Bates,* 313 N.C. 580, 581, 330 S.E.2d 200, 201 (1984); *State v. Bullard,* 312 N.C. 129, 160, 322 S.E.2d 370, 387 (1984).

Upon a motion to dismiss, "the trial court must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from that evidence." *State v. Saunders,* 317 N.C. 308, 312, 345 S.E.2d 212, 215 (citing *State v. Bullard,* 312 N.C. 129, 322 S.E.2d 370). "Defendant's evidence rebutting the inference of guilt may be considered only insofar as it explains or clarifies evidence offered by the state or is not inconsistent with the state's evidence." *State v. Furr,* 292 N.C. at 715, 235 S.E.2d at 196. In considering the dismissal motion the trial court is only concerned with sufficiency of the evidence to carry the case to the jury and not its weight. *State v. Mercer,* 317 N.C. 87, 96, 343 S.E.2d 885, 890 (1986).

There is no contention that the victim did not die by virtue of a criminal act. We therefore consider first whether the evidence was sufficient to identify defendant as the perpetrator. Since no one saw defendant actually commit either the robbery or the homicide, the legal question is whether the circumstantial evidence is sufficient to permit a reasonable inference that this defendant committed the offense charged.

The test of sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both. (Citations omitted.) When the motion . . . calls into question the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty. (Citations omitted.) In passing on the motion, evidence favorable to the State is to be considered as a whole in order to determine its sufficiency. This is especially true when the evidence is circumstantial since one bit of such evidence will rarely point to a defendant's guilt. (Citations omitted.)

*State v. Mercer*, 317 N.C. at 97, 343 S.E.2d at 891 (quoting *State v. Powell*, 299 N.C. 95, 98-99, 261 S.E.2d 114, 117-18 (1980)).

Taken in the light most favorable to the State, the evidence tended to show the following: On the evening of 5 July 1987 defendant and his brother Gordon, while drinking and riding in Gordon's automobile, drove to several different convenience stores beginning at approximately 8:30 p.m.; the last stop was the Handy Mart store on Highway 117; it was near closing time and there were few customers. There was also evidence that when defendant arrived at the convenience store a customer was in the store, left, and defendant followed her for some distance. The jury could reasonably infer that defendant followed the customer to determine if there were any potential witnesses and since it appeared that the potential witness did not acknowledge defendant's presence in any way, there was no need to continue to pursue her. Defendant's family moved around from place to place because they were unable to pay rent, and at the time of the murder and robbery were living with defendant at his mobile home. Defendant's brother Gordon's first automobile payment was due on 5 July and his automobile would possibly be repossessed as had happened in the past with other automobiles. A few days prior to the robbery defendant purchased the murder weapon with a partial cash payment, the remainder to be paid later. Defendant's automobile was in constant need of fuses, but he left the fuses on the counter when he left the store. Defendant was at the store at the time of the shooting and saw the clerk lying on the ground immediately thereafter. Defendant, with his brother, left the scene immediately

after the shooting, leaving the wounded clerk lying on the ground, apparently seriously injured. The murder weapon belonged to defendant and was in his possession both before and a few weeks after the shooting; and when the murder weapon was retrieved from defendant, he was threatening suicide.

From the evidence the jury could reasonably infer: that on 5 July 1987 defendant and his brother drove around to several different convenience stores looking for a store to rob and that the Handy Mart was chosen for the robbery since when they arrived it was near closing time and there were few customers; the motive for the robbery was to secure funds for himself and for his family; that defendant served as a lookout for his brother; that the fuses were left on the counter because defendant could not pay for them at that time; that defendant left the scene of the crime and failed to communicate with police or emergency personnel in order to avoid being charged with a crime; that defendant was upset and threatened suicide because of his participation in the robbery and resulting homicide; and that defendant parted with his pistol only for the purpose of its use by his brother if necessary to complete the robbery or dispose of witnesses. We hold that the evidence taken as a whole was sufficient for the jury to find that defendant aided and abetted his brother in the commission of armed robbery and that the homicide occurred during the commission of the armed robbery. A murder committed in the perpetration or attempt to perpetrate the felony of armed robbery is murder in the first degree. *State v. Chavis*, 231 N.C. 307, 56 S.E.2d 678 (1949). The circumstantial evidence permits a reasonable inference that this defendant was a perpetrator of the felony of armed robbery. The evidence was therefore sufficient to identify defendant as the perpetrator of the crime of murder in the first degree based on the felony murder rule.

[2] We next consider whether the evidence was sufficient to survive the motion to dismiss on the charge of first degree murder based on premeditation and deliberation. First degree murder is the "unlawful killing of another with malice and with premeditation and deliberation." *State v. Saunders*, 317 N.C. at 312, 345 S.E.2d at 215 (quoting *State v. Calloway*, 305 N.C. 747, 751, 291 S.E.2d 622, 625 (1982)). "Premeditation means that the act was thought out beforehand for some length of time, however short . . . . Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an

unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation . . . ." *State v. Bullock*, 326 N.C. 253, 257, 388 S.E.2d 81, 88 (1990); *see also State v. Saunders*, 317 N.C. 308, 345 S.E.2d 212. "Ordinarily, premeditation and deliberation must be proved by circumstantial evidence." *State v. Saunders*, 317 N.C. at 312, 345 S.E.2d at 215. Circumstantial evidence is "evidence that is applied indirectly 'by means of circumstances from which the existence of the principal fact may reasonably be deduced or inferred.' " *State v. Thorpe*, 326 N.C. 451, 455, 393 S.E.2d 311, 313 (1990) (quoting 1 Brandis on North Carolina Evidence 3d § 76 (1988) ).

Circumstances to be considered in determining whether a killing was done with premeditation and deliberation include:

(1) want of provocation on the part of the deceased; (2) the conduct and statements of defendant before and after the killing; (3) threats and declarations of defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; and (5) evidence that the killing was done in a brutal manner.

*State v. Saunders*, 317 N.C. at 313, 345 S.E.2d at 215.

The evidence, considered in the light most favorable to the State, discloses that the trial judge properly denied defendant's motion. There is no evidence of provocation by the deceased. There is evidence that defendant's conduct before the killing appeared to be that of a person "casing a job," preparing to commit a robbery, and since he was armed, anticipating a possible homicide. Defendant testified that he and Gordon had driven to several convenience stores on the day of the robbery and shooting, that they stopped at the Handy Mart at closing time, that no other customers were in the store, and that he saw the victim follow Gordon out of the store arguing with him, heard a noise, then saw the victim on the ground, and immediately left the scene. Defendant also stated that while his brother was in the store, defendant was sick and waited in the automobile. It is reasonable to infer that defendant was serving as a lookout for the robbery. Evidence of defendant's conduct before and after the killing raises an inference that defendant cased the store, followed a customer to possibly eliminate potential witnesses, returned to the store, and participated with his brother in the robbery and resulting homicide.

Declarations of defendant before and during the course of the robbery and homicide permit a reasonable inference that defendant was in need of money. Defendant's girlfriend testified that a couple of days prior to the robbery defendant purchased the murder weapon partially on credit. She also testified that he was in constant need of fuses for his automobile. In addition to her testimony, defendant testified that he went to the store for fuses but left them on the counter. A jury might reasonably infer that he left them there because he did not have the money to pay for them. There was also testimony that defendant continually helped his family members financially. On 5 July defendant's brother did not have the money to make the first payment on his automobile. Defendant spent the day with his brother driving to several convenience stores, arriving at the Handy Mart store near closing time. A robbery and homicide occurred immediately thereafter. Witness Bryant saw no indications that the store had been robbed earlier. It is therefore reasonable to infer that the robbery and homicide occurred after Ms. Bryant left, and since defendant admitted being at the store at closing, it is reasonable to infer that he was also present at the time of the homicide.

There was no evidence of threats, ill-will, or previous difficulty between the parties, but that is not unusual in robbery-murder cases. The evidence does show that the victim was killed in a brutal manner by a shot at close range to the head, and that her death was not instant.

We conclude that the circumstantial evidence in this case, taken as a whole, was sufficient to permit the jury to reasonably infer that defendant's brother murdered the victim with premeditation and deliberation and that defendant aided and abetted his brother in the commission of the crime. One who aids and abets another in the commission of murder is guilty as a principal. *State v. Dawson*, 272 N.C. 535, 129 S.E.2d 1 (1967). The other elements of murder being clearly present, the judge did not err in denying defendant's motion to dismiss the charge of murder in the first degree based on malice, premeditation and deliberation made at the close of all the evidence.

[3] On the second issue the question is whether the trial court erred by failing to suppress defendant's pistol, ammunition, and results of testing done on them. Defendant contends that this evidence was seized as a result of violations of his fourth amend-

ment rights. However, the evidence shows that defendant voluntarily unloaded the pistol and handed the pistol and the ammunition to the police officer. There is certainly no search and seizure in the constitutional sense under such circumstances. "When the evidence is delivered to a police officer upon request and without compulsion or coercion, there is no search within the constitutional prohibition against unreasonable searches and seizures." *State v. Reams*, 277 N.C. 391, 396, 178 S.E.2d 65, 68 (1970), *cert. denied*, 404 U.S. 840 (1971); *see also State v. Small*, 293 N.C. 646, 239 S.E.2d 429 (1977) (defendant's clothes given to police by his mother — not an unreasonable search and seizure).

Defendant contends, however, that the search and seizure violation occurred later, either when the officer turned the pistol and ammunition over to another officer for investigative purposes or when the officer later declined to return the pistol and ammunition to defendant at his request. However, since the pistol and ammunition were already lawfully in the possession of the police officer he was not required to return it to the owner if there is probable cause to retain it. Probable cause arises when facts before an officer would "warrant a [person] of reasonable caution" in the belief that an object may be useful as evidence of a crime. *Carroll v. United States*, 267 U.S. 132, 162, 69 L. Ed. 543, 555 (1925). Officer Anderson learned that a detective was investigating a homicide committed with a black powder weapon. Defendant's pistol was a black powder weapon. Both sides agree that a black powder pistol is not a common weapon. The State offered testimony that the officer did not know how to unload the weapon, and defendant testified that he purchased the weapon because he thought it was an antique. Defendant was in possession of the weapon when the officers arrived to investigate defendant's threatened suicide and defendant appeared to be thoroughly familiar with it. The facts before Officer Anderson were sufficient to cause a person of reasonable caution to believe that the black powder pistol and the ammunition might be useful as evidence of the murder of the victim in this case. Under these circumstances, it was not a violation of defendant's fourth amendment rights to retain both the weapon and the ammunition.

[4] Defendant's contention that the trial court erred by failing to suppress the forensic testing on defendant's pistol and ammunition which established that his black powder pistol was the murder weapon is without merit. Admitting into evidence results of tests

performed on items lawfully seized without a warrant is not a constitutional violation. *United States v. Edwards*, 415 U.S. 800, 39 L. Ed. 2d 771 (1974). We reject defendant's second contention.

[5]   On the third issue, defendant contends that the trial court's instructions to the jury on acting in concert and aiding and abetting allowed him to be convicted on theories unsupported by the evidence. The trial judge gave the following instructions:

> And I charge you on the legal concept of acting in concert. For a person to be guilty of a crime it is not necessary that he himself, such as Albert Lane, do all the acts necessary to constitute the crime. If two or more people, such as the two brothers Albert and Gordon Lane, act together with a common purpose to commit robbery or murder in the first or second degree, each of them is held responsible for the acts of the other done in commission of the murder.
>
>                               . . . .
>
> Also another similar doctrine of the law but yet distinguished is the doctrine of aiding and abetting, a felony. Now, a person may be guilty of murder in the first degree or murder in the second degree although he personally does not do any of the acts necessary to constitute the murder. A person who aids and abets another to commit murder in the first or second degree is also guilty of that crime. You must clearly understand that if he does aid and abet, he is guilty of murder in the first or second degree just as if he had personally done all the acts necessary to constitute that crime.

Since defendant did not object to these instructions at trial, we consider this assignment under the plain error rule. "Before deciding that an error by the trial court amounts to 'plain error,' the appellate court must be convinced that absent the error the jury probably would have reached a different verdict." *State v. Joplin*, 318 N.C. 126, 132, 347 S.E.2d 421, 425 (1986) (citations omitted). The test for plain error "places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have preserved their rights by timely objection." *Id.*

Defendant contends that there was no evidence to support either acting in concert or aiding and abetting. Since the jury convicted defendant of murder in the first degree based on malice, premeditation and deliberation, and based on the felony murder

rule, defendant's contention must be rejected if, without the instructions, the jury would nevertheless have convicted defendant of first degree murder under either theory. We find the evidence, when viewed as a whole, sufficient to permit the jury to infer that defendant and his brother acted together with a common purpose to commit, at least, the robbery and that defendant aided and abetted his brother in the commission of the crime of murder in the first degree based on the felony murder rule. Thus, even assuming error arguendo, we are not convinced that absent the alleged error the jury probably would have reached a verdict other than murder in the first degree. Therefore, defendant has failed to meet his burden of showing error under the plain error rule, and this contention is also rejected.

We conclude that defendant has had a fair trial, free of prejudicial error.

No error.