**STATE v. PLEASANT**

[342 N.C. 366 (1995)]

STATE OF NORTH CAROLINA v. MARTIN THOMAS PLEASANT

No. 103A95

(Filed 8 December 1995)

## 1. Evidence and Witnesses § 1298 (NCI4th)— first-degree murder—defendant's inculpatory statements—mental condition of defendant

There was no error in a first-degree murder prosecution in the admission of defendant's incriminating statements where defendant drank an organophosphate pesticide and told a friend shortly before losing consciousness that he had killed his father, and described the killing to his family after he regained consciousness in the hospital. The trial court's findings that defendant was conscious, alert and appeared in control of his faculties at the time the statements were made, that the organophosphates had metabolized when he made the statement to his family, and that the drugs with which he was treated rendered him more coherent and rational were supported by the record. Furthermore, defendant's psychiatric expert testified that defendant was awake and able to communicate with the medical staff prior to the statement to his family, that defendant had appeared coherent and engaged in logical conversation with her, and that his medication was having a positive effect on his cognitive abilities. The very fact that defendant not only remembers making the statements but testified as to his motivation for making those statements belies any claim that the statements were not voluntary based on his mental capacity. Finally, defendant makes no claim of coercion by his friend or family members and therefore had no basis for suppression of his statements.

**Am Jur 2d, Evidence § 744.**

**Sufficiency of showing that voluntariness of confession or admission was affected by alcohol or other drugs. 25 ALR4th 419.**

## 2. Criminal Law § 610 (NCI4th)— first-degree murder—motion to dismiss for insufficient evidence—incompetent evidence

It was noted that all evidence admitted, whether competent or incompetent, may be considered in ruling on a motion to dismiss for insufficiency of the evidence.

**Am Jur 2d, Evidence § 1435.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by Stephens (Ronald L.), J., at the 22 August 1994 Criminal Session of Superior Court, Harnett County, upon a verdict of guilty of first-degree murder in a case in which defendant was not tried capitally. Heard in the Supreme Court 17 November 1995.

*Michael F. Easley, Attorney General, by Gail E. Weis, Associate Attorney General, for the State.*

*Patrick H. Pope for defendant-appellant.*

FRYE, Justice.

In a proper indictment, defendant, Martin Thomas Pleasant, was charged with the murder of his father, Jerry Thomas Pleasant. Defendant was tried in a noncapital trial on the charge of murder after entering a plea of not guilty. Defendant appeals from a sentence of life imprisonment entered upon a jury verdict finding him guilty of first-degree murder on the theories of malice, premeditation, and deliberation and of lying in wait. We conclude that defendant received a fair trial free of prejudicial error.

Most of the evidence at trial was essentially uncontradicted. Defendant lived in a separate dwelling on his parents' farm. Defendant worked for his parents on their farm, which is located outside of Angier, North Carolina.

On 2 May 1993, Jerry Pleasant left home at approximately 9:00 p.m. to turn off the irrigation system on the farm. The victim watered his tobacco beds every night at dusk for about forty-five minutes to an hour using an irrigation system that pumped water from a pond located on his property. Defendant's apartment was located south of this pond.

At approximately 9:30 or 9:45 p.m., defendant called his parents' house and asked to speak to his father. Mrs. Pleasant told defendant that his father had gone to turn off the irrigation system. Defendant asked her to have his father call him about planting tobacco the next day.

After speaking with defendant, Mrs. Pleasant attempted to contact the victim on the telephone in his truck, but there was no answer.

Mrs. Pleasant did not find this unusual since the telephone often did not work close to the house. She attempted to telephone him two other times during the evening. Also during the evening, she went onto the front porch, where she noticed that the irrigation system had been turned off and that no lights were visible in the field. Mrs. Pleasant retired to bed at about 11:15 p.m., annoyed that her husband had not called but not worried because it was not unusual for the local farmers to sit and talk late into the night during this time of year.

At approximately 2:10 a.m. on 3 May 1993, Mrs. Pleasant awoke and realized that her husband was not in bed. Feeling that something was wrong, she looked outside and saw no lights in the field or in defendant's apartment. She got her flashlight and drove to the tobacco bed, where she found the victim's pickup truck parked. Mrs. Pleasant noticed that the truck door was open, the engine was not running, and the headlights were off. She found her husband lying on the ground on the backside of the irrigation pump, next to the pond. He was lying on his side, and his body was cold and motionless. Mrs. Pleasant noticed what appeared to be two bumps on her husband's head.

Mrs. Pleasant was shaking and was unable to figure out how to use the telephone in the truck. She drove to defendant's apartment to call for help. She knocked on the door, saying, "Mark, open the door. Your daddy is dead." Defendant was drunk and refused to allow her to use the telephone, saying, "Oh Mother, he's not dead." Mrs. Pleasant got back into her car, went home, and called for assistance. The police responded to the Pleasant residence at approximately 2:40 a.m. on 3 May 1993.

An agent from the State Bureau of Investigation interviewed Mrs. Pleasant and defendant. Defendant consented to a gunshot residue test on his hands after being interviewed. The investigators who searched the field where the victim's truck was found observed that the truck's engine was not running and that its headlights were off. The autopsy report revealed that the victim had died from multiple gunshot wounds.

On 3 May 1993, Mrs. Pleasant went to defendant's apartment with Robin and Steve Marks, defendant's sister and brother-in-law. Defendant had not visited his mother since his father's body was found that morning. Defendant was still drinking alcohol.

Mrs. Pleasant had defendant involuntarily committed to Dorothea Dix Hospital for substance abuse.

On 5 May 1993, defendant was released to attend his father's funeral. Before leaving for the funeral, defendant met with a friend, Kent Butterfield, at defendant's parents' residence. Defendant and Butterfield observed a law enforcement dive team searching for the murder weapon in a pond near the residence.

Defendant asked Butterfield to accompany him across the road to defendant's apartment. At the apartment, defendant excused himself, went into a downstairs bathroom, and emerged a few minutes later. Defendant was drinking a soft drink and spitting repeatedly. Butterfield and defendant then walked back across the road to the residence of defendant's parents. Defendant began vomiting and sat down on the ground. He then told Butterfield, "Kent, I killed my father. I want to die. Don't tell anybody."

Almost immediately after making this statement, defendant began to shake and sweat and was foaming from the mouth. After suffering convulsions, defendant lost consciousness. An ambulance transported defendant to Good Hope Hospital in Erwin, North Carolina, and he was transferred from there to Duke University Medical Center in Durham, North Carolina. At Duke University Medical Center, defendant was placed in the intensive care unit, where he was treated for organophosphate pesticide poisoning. Defendant remained unconscious and in critical condition for several days.

Butterfield reported to the police the statements defendant made to him. Defendant had taken out a $125,000 universal life insurance policy on his father for which he paid $100.00 per month. Defendant, prior to the death of his father, told another friend, Milton Godwin, that he did not like his mother having to work at a convenience store, that he had taken out an insurance policy on his father, and that he was going to kill his father or kill himself.

On 13 May 1993, a member of the dive team from Fort Bragg found a .25- or .22-caliber revolver belonging to the victim in the pond near defendant's apartment. The State Bureau of Investigation crime laboratory determined that this pistol was the murder weapon.

On 19 May 1993 at approximately 1:00 p.m., defendant was visited in his room at Duke University Medical Center by his mother; his sister, Robin Marks; and her husband, Stephen Marks. Defendant had not been able to talk before that date because he was on a ventilator

with a breathing tube inserted in his throat. During the visit, defendant, in response to a question from his mother, acknowledged that he had killed his father. Defendant then said, among other things, that he had taken a revolver from his parents' attic at about 2:30 p.m. on Sunday, 2 May 1993; that he had waited in a field for his father to come to turn off the irrigation pump; that when his father arrived, defendant shot him without being seen; that he had turned off the engine and the headlights of his father's pickup truck; and that he had thrown the gun in the pond.

At trial, defendant testified that he did not murder his father and that he believed that his uncle, Donnie Hunter, killed his father. Defendant testified that he drank the pesticide because he thought he was going to be blamed for the murder and had mentally "given up." Defendant admitted telling Kent Butterfield that he had killed his father, saying that he felt responsible and wanted to take the blame since he had taken his father's gun and attempted to sell it to Hunter. Despite the fact that defendant did not sell the gun to Hunter, defendant testified that he believed that Hunter then used that gun to kill his father. Defendant also admitted that while he was at Duke University Medical Center, he told his family members that he had killed his father. Defendant again testified that he felt responsible for the death and wanted to take the blame for it.

Defendant offered evidence at trial that he suffered from alcohol dependency and a "schizoid personality disorder." Defendant had a history of alcohol abuse. Further, defendant offered some evidence that he was suffering from a memory impairment and depression. Defendant's expert witness concluded that, based on defendant's alcohol dependency, his alcohol consumption on 2 May 1993, and his personality disorder, defendant's ability to make and carry out plans could have been affected.

[1] Defendant first assigns error to the trial court's denial of his motion to suppress certain incriminating statements made by him to his friend and his relatives. Defendant made two confessions: (1) to Kent Butterfield after ingesting the poison that caused his hospitalization, and (2) to family members in the hospital when he regained consciousness. Defendant does not argue that he did not make the statements but instead contends that those statements were not given freely, voluntarily, and understandingly by him. Defendant argues that the State did not meet its burden of proof as to either alleged confession.

Prior to ruling on the motion to suppress, the trial court held an extensive *voir dire*. At the suppression hearing, defendant presented evidence that he had ingested organophosphate pesticide poison on 5 May 1993. Within seconds, the poison took effect, causing him to become very sick and lose consciousness. Defendant argues that it was only after the pesticide began to take effect that he made the statement to Butterfield that he had killed his father. Those were his last words before he lapsed into unconsciousness. Therefore, defendant contends that the statements were a product of the effects of the poisonous chemical and were not made by him voluntarily and understandingly.

Likewise, defendant argues that the statements made by him to his mother, sister, and brother-in-law in the hospital were not voluntarily and understandingly made due to the medications defendant was taking; defendant's depression, alcohol dependency, organophosphate pesticide poisoning, anoxia, and insult to the brain; and the effects of all the foregoing on defendant's ability to think and remember.

Following the hearing, the trial court found as fact that "[a]t the time [defendant] made this statement to Butterfield, defendant was conscious, alert and appeared to be in control of his mental faculties. He made the statement spontaneously to Butterfield, addressing him by name." The court also found that "[a]lmost immediately after making this statement, defendant began suffering convulsions and lost consciousness."

As to the statements made to his family at the hospital, the trial court found as fact that "[a]t the time [defendant] made these statements to his mother, sister, and brother-in-law, defendant's voice was weak, but he was conscious and alert and in control of his mental faculties. His response[s] to questions propounded by these same family members were coherent and rational." The court further found that although defendant had been treated with a number of drugs during his stay in the hospital, "[w]ithin the twenty-four hours preceding these statements, defendant had received haldol, an anti-psychotic drug, and ativan, an anti-anxiety drug, within prescribed and medically acceptable dosages. The effect of these drugs was to render defendant more coherent and rational than he likely would have been without these drugs," and "[a]ny organophosphate herbicides defendant may have consumed on May 5, 1993 had been metabolized and eliminated by his body by May 19, 1993." The trial court concluded as

a matter of law that "[e]ach of defendant's statements was made knowingly, willfully and voluntarily at a time when defendant was rational and coherent."

In *State v. Massey*, 316 N.C. 558, 573, 342 S.E.2d 811, 820 (1986), this Court said:

> The trial court's findings of fact following a *voir dire* hearing on the voluntariness of a confession are conclusive on appeal if they are supported by competent evidence in the record. *State v. Jackson*, 308 N.C. 549, 304 S.E.2d 134 (1983); *see also State v. [Rook]*, 304 N.C. 201, 283 S.E.2d 732 (1981). "No reviewing court may properly set aside or modify those findings if so supported. This is true even though the evidence is conflicting." *State v. Jackson*, 308 N.C. at 569, 304 S.E.2d at 145. Thus, we must determine whether the findings are supported by the record.

In the instant case, the trial court's findings of fact are supported by the record and, therefore, are conclusive on this appeal. The evidence indicates that defendant, of his own free will, admitted his participation in the shooting to Butterfield and to his family without coercion from them. Defendant testified on direct examination that he told Butterfield, "I killed him, I killed my father," and that he may have said, "I want to die." He further testified that he made those statements to Butterfield because he felt responsible and wanted to take the blame for his father's death.

Furthermore, defendant's expert witness in psychiatry, Dr. Valerie Holmes, testified on cross-examination that defendant was awake and able to communicate with the medical staff prior to 19 May 1993. Dr. Holmes confirmed that all of the drugs administered to defendant, other than Haldol, Ativan, and Benadryl, were out of defendant's system by 19 May 1993. She further testified that she talked with defendant on 19 May 1993 about his suicide attempt and that he appeared coherent and engaged in logical conversation, giving appropriate answers to questions. Dr. Holmes testified that defendant's medication was having a positive effect on his cognitive abilities and that she could not say that defendant's cognitive abilities were impaired to the extent that he did not understand or appreciate what he was saying when he talked to his family on 19 May 1993. Additionally, defendant testified on direct examination that he remembered making the statements to his family while in the hospital. The State argues that the very fact that defendant not only remembers making the statements, but testified as to his motivation for making those statements, belies

any claim that the statements were not voluntary based on defendant's mental capacity. We agree.

Furthermore, "[a]s a general rule, voluntary admissions of guilt are admissible in evidence in a trial. To render them inadmissible, incriminating statements must be made under some sort of pressure." *State v. Boykin*, 298 N.C. 687, 696, 259 S.E.2d 883, 889 (1979). Defendant makes no claim of coercion by his friend or his family members. Therefore, defendant had no basis for suppression of his statements to Butterfield or to his family members. The trial court was correct in denying defendant's motion to suppress these statements. Accordingly, we reject defendant's first assignment of error.

Defendant next assigns as error the trial court's excluding from evidence statements by third parties, taken by law enforcement officers, implicating a person other than defendant as the perpetrator of the murder of Jerry Pleasant. Defendant expressly abandoned this assignment of error.

[2] Defendant further assigns as error the trial court's denial of his motion to dismiss at the close of the State's evidence and at the close of all the evidence. After the denial of his motion to dismiss at the close of the State's evidence, defendant proceeded to offer evidence, thereby waiving his motion to dismiss at the close of the State's evidence. *State v. Lane*, 328 N.C. 598, 403 S.E.2d 267, *cert. denied*, 502 U.S. 915, 116 L.Ed.2d 261 (1991); *State v. Saunders*, 317 N.C. 308, 345 S.E.2d 212 (1986); *State v. Leonard*, 300 N.C. 223, 266 S.E.2d 631, *cert. denied*, 449 U.S. 960, 66 L.Ed.2d 227 (1980). We, therefore, consider only defendant's motion to dismiss made at the close of all the evidence.

As to the denial of his motion to dismiss at the close of all the evidence, defendant argues that without the statements made by him to Butterfield and to his family members, the State did not have sufficient evidence to submit the matter to the jury on the issue of first-degree murder. Since we have held that the statements made by defendant to Butterfield and his family members were properly admitted into evidence, we conclude that there was sufficient evidence for the jury to find defendant guilty of first-degree murder. We note, however, that, in ruling on a motion to dismiss for insufficiency of the evidence, all evidence actually admitted, whether competent or incompetent, may be considered. *State v. Stone*, 323 N.C. 447, 373 S.E.2d 430 (1988). Defendant admits that if the statements made by him to Butterfield and to his family are included, the evidence is suf-

ficient to go to the jury. Accordingly, this assignment of error is without merit.

For the foregoing reasons, we hold that the defendant received a fair trial, free of prejudicial error.

NO ERROR.