******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SHELVONN JONES
(SC 19097)
(SC 19098)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued April 21—officially released December 22, 2015*

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *David Holzbach*, former senior assistant state's attorney, for the appellant in Docket No. SC 19097 and the appellee in Docket No. SC 19098 (state).

*James Streeto*, assistant public defender, for the appellee in Docket No. SC 19097 and the appellant in Docket No. SC 19098 (defendant).

*Opinion*

PALMER, J. The state and the defendant, Shelvonn Jones, appeal from the judgment of the Appellate Court, which reversed the judgment of conviction, rendered after a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (2). See *State* v. *Jones*, 139 Conn. App. 469, 470, 487, 56 A.3d 724 (2012). The state claims that the Appellate Court improperly concluded that the defendant was denied his right to a fair trial due to certain alleged improprieties that the senior assistant state's attorney (prosecutor) committed during his cross-examination of the defendant and in closing argument. The defendant claims that the Appellate Court incorrectly concluded that the trial court properly had denied his motion to suppress evidence of the knife that was used in the commission of the assault. The defendant also raises a claim that the Appellate Court did not address, namely, that the trial court improperly instructed the jury on the initial aggressor exception to self-defense. Because we agree with the state's claim and reject the defendant's claims, we reverse the judgment of the Appellate Court and remand the case to that court with direction to affirm the judgment of the trial court.

The following evidence was adduced by the state at trial. On May 20, 2009, the fifty-three year old victim, George Harris, who resided on New Street in the city of Danbury with his sister and niece, arrived home from work and saw the thirty-two year old defendant standing in his driveway, arguing with Harris' sister, Mary Ann Harrison, and Larry Johnson, a private security guard employed by Harrison. Johnson told the defendant to leave the property, but the defendant would not do so. Harris turned to his niece and asked whether the defendant was the man she previously had told to stay off their property, and she responded in the affirmative. Harris then reiterated Johnson's directive that the defendant leave the property immediately. As the defendant was leaving, he turned to Harris and stated, "I'll get you."

On June 9, 2009, at approximately 6 p.m., Harris was walking home from work on Kennedy Avenue in Danbury when the defendant approached him in front of the bus station, displayed a knife,[1] and said, "[w]hat's up, Old School?" Harris was frightened by the defendant's gesture and kept walking.

About one hour after arriving home, Harris decided to go for a bike ride. While riding down Beaver Street in Danbury, he saw a man walking toward him. As the man got closer, Harris realized that it was the defendant. Harris was still upset about their earlier encounter and stopped his bicycle to ask the defendant, "what the problem was." As Harris approached him, however, the defendant began swinging the knife at him "like a

wild man."

Harris tried to run away, but the defendant pursued him and slashed his back. Harris jumped back on his bicycle, but, instead of heading home, which would have required Harris to pedal uphill with his back exposed to the defendant, he rode the bicycle downhill into the defendant, knocking him to the ground. He then jumped off of the bicycle and was able to subdue the defendant by pulling the defendant's sweatshirt over his arms and head. By this time, traffic in the street had backed up, and a number of drivers were blowing their horns and using their cell phones to call the police. Harris, who never had previously been in any trouble with the law, feared being arrested, so he released the defendant and ran home.

Officers Michael Reo and David Williams of the Danbury Police Department, who were the first officers to arrive on the scene, found the defendant standing in the roadway, visibly intoxicated. The defendant informed them that he had been in the neighborhood looking for some marijuana when a man approached him on a bicycle and asked if he could change a $50 bill. The defendant told the police that he handed the man two $20 bills but then was unable to find any smaller bills, so he asked the man to return the two $20 bills. The man refused, and the two men tussled until they heard the sound of police sirens, at which point the man ran off with the defendant's money. After relating his story, the defendant asked the officers if they would drive him home. Reo agreed to give the defendant a ride because he considered the defendant to be the victim of a crime and because the defendant was intoxicated.

Meanwhile, when Harris arrived home, he realized that he had sustained serious cuts to his chest and back. After consulting with his sister, Harris decided to call the police. The responding officer summoned paramedics to transport Harris to the hospital, where he received eighteen stitches in his chest and several in his back. The responding officer also broadcast the defendant's name over the police radio system, identifying him as Harris' assailant. When Reo heard the broadcast, he returned to the defendant's residence and placed him under arrest.

Officer Matthew Georgoulis of the Danbury Police Department assisted in arresting the defendant. According to Georgoulis, before placing the defendant into the back of his vehicle, Georgoulis performed a routine pat down of the defendant for weapons but did not have him empty his pockets. Later, while leading the defendant into the police station, Georgoulis noticed the defendant glance back at the vehicle, which struck Georgoulis as suspicious. Georgoulis further stated that he subsequently searched the backseat of his vehicle and discovered a small plastic baggie containing marijuana under the seat. Georgoulis testified that the

baggie had not been there when he inspected the vehicle prior to his shift, and no one had ridden in the backseat before the defendant had done so.

The defendant was charged with attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49 (a) (2), assault in the second degree in violation of § 53a-60 (a) (2), and possession of marijuana in violation of General Statutes § 21a-279 (c). At trial, the defendant testified in his own defense and provided the following account of his encounters with Harris. On the night in question, approximately one hour before the altercation, the defendant was standing on Spring Street in Danbury when Harris approached him and asked if he had any crack cocaine for sale. The defendant told Harris that he was not a drug dealer and "to get the 'F' out of here," which, according to the defendant, angered Harris. The defendant testified that he had never laid eyes on Harris before that moment but previously had "bumped heads" with members of Harris' family and was acquainted with Johnson, the private security guard who worked for Harris' sister. The defendant also testified that he did not display a knife during his initial encounter with Harris.

Approximately one hour later, the defendant was walking up Beaver Street in an extremely intoxicated state when he saw Harris coming toward him on a bicycle. According to the defendant, Harris stopped and commented about "the situation" between them earlier that evening, to which the defendant replied, "I apologize man, I want no problems . . . ." The defendant testified that Harris then asked him if he had change for a $50 bill because he needed it to buy some crack cocaine. The defendant stated that he handed Harris two $20 bills and, while searching his pockets for additional change, saw Harris place the two $20 bills in his pocket. A tussle ensued, and Harris threw his bicycle at the defendant, which caused the defendant to fall to the ground. When the defendant stood up, he pulled a knife out of his pocket and told Harris, "listen, I don't want no problems, just leave me alone, you got the money, go about your business." The defendant stated that it was never his intention to harm Harris with the knife, only to scare him away, and that he had no idea how Harris received the cuts to his chest and back. The defendant surmised that Harris might have sustained the wounds when the two men were scuffling on the ground. According to the defendant, shortly after the fight started, drivers began to blow their horns. When the defendant turned to look at them, Harris rushed toward him, knocked him to the ground and subdued him by pulling his sweatshirt over his head. Throughout the struggle, the defendant held tightly to the knife so that Harris could not take it away and use it against him, which he believed Harris was trying to do. The defendant denied ever telling the police that he was in

the area to buy marijuana. The defendant also denied ever being on Kennedy Avenue or anywhere near the bus station on the evening in question, as Harris had testified.

After the defense rested its case, Harris was recalled by the state as a rebuttal witness and stated that, contrary to the defendant's assertions, he did not seek to purchase drugs from the defendant on the night in question. Harris also explained that he had not taken any illegal drugs since graduating from high school, explaining that his former employer of thirty years, Kimberly-Clark Corporation, had a mandatory drug testing policy. The state also called Harrison and Johnson as rebuttal witnesses. Both of them testified, contrary to the defendant's testimony that he had never seen Harris before the night of the altercation, that the defendant had threatened Harris approximately one month before the encounter in Harris' driveway. In closing arguments, both the prosecutor and defense counsel maintained that the assault charges boiled down to a credibility contest between the defendant and Harris that required the jury to determine which one of them was telling the truth about the circumstances surrounding their altercation. In particular, the prosecutor argued that the defendant had fabricated the story about the larceny and Harris' purported attempt to purchase drugs from him because the police had arrived before the defendant could flee the scene, and he needed to explain his presence there. Defense counsel, on the other hand, asserted that the jury should discredit Harris' testimony that he was not a drug user and that he just happened to encounter the defendant while Harris was riding his bicycle. Counsel further argued, among other things, that a normal person would not ride his bicycle through a "drug infested" area and that Harris' real reason for being there was to buy drugs and to confront the defendant about his refusal to sell him drugs earlier that evening. The jury subsequently found the defendant not guilty of attempt to commit assault in the first degree and possession of marijuana but found him guilty of assault in the second degree. Thereafter, the trial court rendered judgment in accordance with the verdict and sentenced the defendant to a prison term of four years and nine months.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the prosecutor violated the proscription, first articulated by this court in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), against asking a witness "to characterize another witness' testimony as a lie, mistaken or wrong." Id., 712. In support of this claim, the defendant identified three questions posed by the prosecutor on cross-examination that compelled the defendant to comment on the veracity of Harris and certain police officers. The three questions were: (1) "[A]ll this testimony from . . . Harris then about the bus stop; that was a lie?" (2) "And all the police officers'

testimony [about the robbery] is a lie?" (3) "So, what Officer Georgoulis testified to today [about finding marijuana in the backseat of his police car] is all false?" In addition, during closing argument, the prosecutor paraphrased the defendant's answer when the defendant was asked whether he had told the police that he was trying to buy marijuana prior to the altercation as, "I never said that; the police are lying apparently." The state conceded that the challenged questions and closing argument were improper under *Singh* but argued that they were not so prejudicial as to deprive the defendant of a fair trial.

The Appellate Court accepted the state's concession of impropriety but disagreed with its claim that the improprieties were harmless. See *State* v. *Jones*, supra, 139 Conn. App. 475–77. In reaching its determination, the Appellate Court applied the six factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), for determining whether the prosecutorial improprieties were sufficiently serious as to amount to a denial of due process.[2] See *State* v. *Jones*, supra, 477–85. The Appellate Court reasoned that, although the improprieties at issue were not pervasive and defense counsel had not objected to any of them; see id., 477–78, 482; the improprieties were severe because the prosecutor had compelled the defendant to comment on the veracity of Harris and the police officers; see id., 478–79; the improprieties bore directly on the central issue in the case, namely, the defendant's credibility versus that of the state's witnesses; id., 480–81; the state's case was not particularly strong; id., 482; the improprieties were not invited by the defense; id.; and no curative instructions were given. Id. The Appellate Court observed that when these same *Williams* factors were present in other cases involving a violation of *Singh*; see, e.g., *State* v. *Ceballos*, 266 Conn. 364, 414–15, 832 A.2d 14 (2003); this court had concluded that the defendants in those cases had been denied their right to a fair trial. See *State* v. *Jones*, supra, 483–84.

In light of its determination that the defendant was entitled to a new trial due to the *Singh* violations, the Appellate Court did not address the defendant's claims that the prosecutor had engaged in several other instances of impropriety and that the trial court improperly had instructed the jury on the initial aggressor exception to self-defense. Id., 471 n.2, 477. Because the issue was likely to arise again at a retrial, however, the Appellate Court did consider the defendant's contention that the trial court improperly had denied his motion to suppress evidence of the knife that he had used in his altercation with Harris. Id., 470–71. The Appellate Court rejected this claim, concluding that the record supported the trial court's finding that the defendant had voluntarily surrendered the knife to Reo prior to getting into the police car for a ride home and that the police did not exceed the scope of that initial consent.

Id., 485–86. The state's and the defendant's certified appeals followed.[3]

On appeal, the state claims that the Appellate Court incorrectly concluded that the defendant was substantially prejudiced by the improprieties at issue in this case. Specifically, the state argues that the Appellate Court's analysis of the prejudicial effect of the improprieties was seriously flawed because that court (1) failed to consider that two of the improprieties were directed at the drug charge and thus were unlikely to have prejudiced the defendant in view of the fact that the jury had found him not guilty of that charge, (2) never considered the reduced prejudicial effect of the "were they lying" questions in a case that presents a "pure credibility contest" between a defendant and the state's witness, and (3) mistakenly assumed that such improprieties jeopardized the jurors' understanding of the state's burden of proof in all cases.

In his appeal, the defendant claims that the trial court's charge to the jury improperly broadened the initial aggressor doctrine and deprived him of his right to assert a defense of self-defense in that it failed to instruct the jury (1) to analyze Harris' perceptions from the perspective of a reasonable person, and (2) that a person cannot become an initial aggressor on the basis of words alone. The defendant also claims that the Appellate Court was incorrect in concluding that the trial court properly denied his motion to suppress the knife that he had used in his altercation with Harris.

I

STATE'S APPEAL

We first address the state's claim that the Appellate Court incorrectly concluded that prosecutorial improprieties deprived the defendant of a fair trial. Before addressing the merits of this claim, we set forth the standard of review and legal principles governing claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair . . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77–78, 961 A.2d 975 (2009). Accordingly, it is not the prosecutorial impropri-

eties themselves but, rather, the nature and extent of the prejudice resulting therefrom that determines whether a defendant is entitled to a new trial. See id.

In *State* v. *Singh*, supra, 259 Conn. 693, this court held, in accordance with the majority rule in other jurisdictions, "that it is improper to ask a witness to comment on another witness' veracity." Id., 706. "Several reasons underlie the prohibition on [asking] such questions. First, it is well established that determinations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a defendant to comment on another witness' veracity invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." (Citations omitted; internal quotation marks omitted.) Id., 707–708.

"Second, questions of this sort also create the risk that the jury may conclude that, in order to [find] the defendant [not guilty], it [first] must find that the witness has lied. . . . This risk is especially acute when the witness is a government agent in a criminal case. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . such as [in cases involving] misrecollection, failure of recollection or other innocent reason[s]." (Citations omitted; internal quotation marks omitted.) Id., 708.

"Similarly, courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 709–10; see also *State* v. *Emmett*, 839 P.2d 781, 787 (Utah 1992) (asking defendant to comment on another witness' veracity is unfairly prejudicial because it suggests that "[the] witness is committing perjury even though there are other explanations for the inconsistency . . . [and such questioning] puts the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury").

In light of the state's concession that the prosecutor violated *Singh* first by asking the defendant to comment on the veracity of other witnesses and then by referring

to the defendant's response to one of those questions in closing argument, we need only determine whether these improprieties deprived the defendant of a fair trial. In addressing this question, we focus on the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540; see footnote 2 of this opinion; namely, the extent to which the improprieties were invited by the defense, the severity and frequency of the improprieties and their centrality to the critical issues in the case, and the strength both of the state's case and of any curative measures taken by the court.

We further note that, "[r]egardless of whether the defendant has objected to an . . . [impropriety], a reviewing court must apply [these] . . . factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 560, 78 A.3d 828 (2013). "This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the [foregoing] factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) Id., 560–61.

Finally, "when a defendant raises on appeal a claim that improper remarks by the prosecutor deprived [him] of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process."[4] *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012). It is also well established that, when there are multiple charges in a case, the reviewing court must consider the effect of the prosecutorial impropriety on each charge separately because, "[d]epending on the outcome of the analysis, the conviction on some charges may be allowed to stand, while others may be reversed." *State* v. *Spencer*, 275 Conn. 171, 182, 881 A.2d 209 (2005).

Applying the foregoing principles to the present case, we agree with the state that the Appellate Court incorrectly determined that the *Singh* violations deprived the defendant of a fair trial. We reach this conclusion for several reasons. First, in considering the severity of such improprieties, we accord considerable weight to the fact that defense counsel did not object to any of those improprieties, a strong indicator that counsel did not perceive them as seriously jeopardizing the

defendant's fair trial rights. See, e.g., *State* v. *Ceballos*, supra, 266 Conn. 414 (emphasizing "that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments [did] not rise to the magnitude of constitutional error" [emphasis omitted]); see also *State* v. *Warholic*, 278 Conn. 354, 402, 897 A.2d 569 (2006) (defendant who fails to object to improper remarks bears significant responsibility for fact that alleged improprieties went uncured). Second, and more important, as the Appellate Court observed, the improprieties at issue were neither pervasive nor confined to a discrete portion of the trial; *State* v. *Jones*, supra, 139 Conn. App. 482; but, rather, consisted of four remarks spread over the course of a five day trial. Moreover, although defense counsel sought no curative measures, the trial court, both at the commencement and at the conclusion of the trial, instructed the jury that the "testimony of a police officer is entitled to no special or exclusive weight merely because it comes from a police official," and that the jurors therefore "must determine the credibility of police officers in the same way as you would any other witness[es] . . . ."[5] These instructions, which the jury is presumed to have followed, would have ameliorated the harmful effect of all but one of the improprieties.

Perhaps the most significant reason why the defendant in the present case was not unduly prejudiced by the prosecutor's *Singh* violations is that two of them—arguably the two most serious violations because they pitted the defendant's credibility directly against that of the police—were not directed at the assault charge but, rather, at the drug charge, which resulted in an acquittal. Specifically, on cross-examination, the prosecutor asked the defendant, "[s]o, what Officer Georgoulis testified to today [about finding marijuana in the backseat of his police car] is all false?" The defendant responded: "Yes, sir."[6] Relatedly, in his closing argument, the prosecutor paraphrased the defendant's denial that he had told the police that he was trying to buy marijuana on the night of the altercation as, "I never said that; the police are lying apparently."[7] Because the jury found the defendant not guilty of the drug charge, however, those two improprieties could not have prejudiced the defendant unduly with respect to that charge. Cf. *State* v. *Ciullo*, 314 Conn. 28, 60, 100 A.3d 779 (2014) ("[e]ven if all of the statements had affected a determination of credibility, the defendant was acquitted of some of the charges against him, clearly demonstrating the jurors' ability to filter out the allegedly improper statements and make independent assessments of credibility").

Nor can we conclude that those improprieties prejudiced the defendant with respect to the assault charge because it is undisputed that no police officer provided material testimony with respect to that charge. See

*State* v. *Spencer*, supra, 275 Conn. 182 (reviewing court must consider prejudicial impact of impropriety on each individual charge). As we previously noted, by the time the police arrived at the scene of the altercation, the fight between the defendant and Harris had already ended. The officers' testimony regarding the altercation, therefore, was limited to repeating what the defendant had told them when they arrived, namely, that he had just been robbed by a man on a bicycle who had asked him to make change for a $50 bill. In considering the evidence related to the assault charge, therefore, the jury never was required to reconcile the defendant's testimony with the contradictory testimony of any police officer, a paramount concern under *Singh*.[8] Indeed, if anything, we believe that the officers' testimony would have bolstered the defendant's testimony by demonstrating that the defendant's account of the altercation remained consistent over time.[9]

For this reason, we also conclude that the third *Singh* violation, which ostensibly *did* pit the defendant's testimony against that of the police officers with respect to the assault charge, did not prejudice the defendant. During cross-examination, the prosecutor asked the defendant whether "all of the police officers' testimony [contradicting everything about the larceny] is a lie?"[10] The prosecutor apparently was referring to the defendant's testimony that the altercation began when Harris stole $40 from him. The defendant responded, "I didn't say that. What part of their testimony?" The defendant was understandably confused by the prosecutor's question because, as we have explained, the officers' testimony about the assault and the alleged larceny did not in any way conflict with that of the defendant's testimony, a fact that could not have been lost on the jury. In light of the foregoing, we cannot discern how the prosecutor's question, improper though it may have been, prejudiced the defendant with respect to the assault charge.[11]

Indeed, the principal reason why a prosecutor may not ask a defendant about the truthfulness of an officer's contradictory testimony is to reduce the risk that the jury will resolve material conflicts between the testimony of the defendant and the officer in favor of the state, out of a concern that to do otherwise would reflect adversely on the honesty of the officer. See, e.g., *State* v. *Singh*, supra, 259 Conn. 708–709. It is axiomatic, however, that, when, as in the present case, the jury is *not* required to resolve any such conflict, the harm that might otherwise ensue from such a question will be significantly reduced if not completely avoided. Furthermore, this court has never had a case in which a *Singh* violation, standing alone, was deemed sufficiently egregious to entitle the defendant to a new trial. Rather, in every case in which a defendant has claimed that the prosecutor improperly asked him to characterize another witness' testimony as a lie, mistaken or

wrong, including *Singh* itself, it was the cumulative effect of the *Singh* violation and the other prosecutorial improprieties that ultimately was deemed to entitle the defendant to a new trial.[12] See, e.g., *State* v. *Ceballos*, supra, 266 Conn. 390–93 (prosecutor's repeated reference to religion and possible divine consequences that awaited defendant as result of his actions was inflammatory and improperly invaded province of jury); *State* v. *Singh*, supra, 710–18 (prosecutor improperly conveyed his personal views regarding evidence, referred to facts not in evidence, and argued that, to find defendant not guilty, jury must find that five government witnesses had lied).

We turn, therefore, to the final impropriety, which, as the state acknowledges, was potentially prejudicial to the defendant because it compelled him to comment on Harris' veracity. As we previously indicated, immediately before the prosecutor questioned the defendant as to whether the officers had lied about the robbery, he also asked him: "Now, all this testimony from . . . Harris then about the bus stop; that was a lie?" The prosecutor apparently was referring to Harris' testimony that, approximately one hour before the altercation, as he was coming home from work, the defendant had approached him in front of the bus station and displayed a knife. The defendant denied ever having been near the bus station on the night in question and called Harris' testimony to the contrary a lie. He maintained, rather, that the first time he saw Harris was on Spring Street, when Harris approached him and asked to buy drugs. We agree with the state that, under the circumstances of this case, which required the jury to decide whether the defendant or Harris was telling the truth, questioning the defendant directly about whether Harris had lied during his testimony was necessarily harmless.

In reaching our determination, we acknowledge that the state's case against the defendant was not particularly strong insofar as it turned entirely on Harris' testimony.[13] We also recognize that the risk that a defendant will be prejudiced by a *Singh* violation may be especially acute when the state's case is founded on the credibility of its witnesses. Cf. *State* v. *Alexander*, 254 Conn. 290, 305, 755 A.2d 868 (2000) (prosecutorial vouching "is especially significant . . . [when] the credibility of the victim and the defendant comprise[s] the principal issue of the case"). As the present case demonstrates, however, that general proposition is not a universal truth. In a case that pits the testimony of the defendant against that of the victim, such that the victim's version of events is directly at odds with the defendant's account of the facts, and there is no way to reconcile their conflicting testimony except to conclude that one of them is lying, it is unlikely that asking the defendant directly whether the victim is lying ever could be so prejudicial as to amount to a denial of due process.

Cf. *State* v. *Fauci*, 282 Conn. 23, 39, 917 A.2d 978 (2007) ("in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and thus to argue, that one of the two sides is lying" [internal quotation marks omitted]). To be sure, as we explained in *State* v. *Singh*, supra, 259 Conn. 707–10, such questioning is never appropriate, and we consistently have declined the state's invitation to carve out an exception to the prohibition against "are they lying" questions in cases involving pure credibility contests. We have done so, however, not because we disagreed with the underlying rationale for such an exception but, rather, because of the difficulty of determining, in the midst of trial, whether the case presents a pure credibility contest or whether the testimonial discrepancies between the two witnesses may be explained by reasons other than perjury or deceit. See, e.g., *State* v. *Ciullo*, supra, 314 Conn. 46 n.14 ("[a] determination of a 'pure credibility case' is an inquiry that may be answered differently depending on the point of view of the inquiring party"); *State* v. *Singh*, supra, 711 ("[i]t would be unwise . . . to make the application of this exception predicated on such a difficult distinction, which is relegated properly to the jury").

Our refusal to adopt the exception advanced by the defendant, however, does not preclude us from acknowledging the logic that underlies that proposed exception in determining whether the defendant was *prejudiced* by the prosecutor's questioning, an inquiry that, under *Williams* and its progeny, is separate and distinct from the issue of whether the questioning was improper in the first place. Indeed, because *Williams* requires that we determine whether the prosecutorial impropriety prejudiced the defendant by evaluating the impropriety in the context of the entire trial, we must consider whether it was possible for the jury to reconcile the testimony of the defendant and Harris without concluding that one of them was lying. When, as in the present case, it is not possible to do so, there is no reasonable possibility that asking the defendant whether the victim testified truthfully would render the trial so unfair as to rise to the level of a due process violation because, in such circumstances, the risks that ordinarily attend such a question simply are not present. For example, asking the defendant in the present case whether Harris was lying could not have led the jurors to overlook the various, possible, innocent reasons for discrediting Harris' testimony because the evidence and the parties' arguments did not allow for any such reasons. Moreover, there was no likelihood that the question invaded the province of the jury or reduced or distorted the state's burden of proof because, in order to decide the case, the jury itself was required to determine which of the two witnesses, Harris or the defendant, was lying. Thus, the answer that the defendant gave in response to the prosecutor's improper "is he lying"

question, although irrelevant, could not have caused the defendant undue harm.[14]

Of course, we do not condone questioning in violation of *Singh*, even when, in light of the facts, the jury necessarily must determine whether the defendant or another witness is lying. In addition, as we previously noted; see footnote 12 of this opinion; *Singh* violations may be so serious, either standing alone or in combination with other improprieties, as to require a new trial. For the reasons that we previously discussed, however, the violations in the present case did not so taint the defendant's trial as to render it fundamentally unfair. We therefore conclude that the Appellate Court incorrectly determined that the improprieties deprived the defendant of his right to due process.[15]

## II

## DEFENDANT'S APPEAL

### A

### Instructions on Initial Aggressor Exception to Self-Defense

We next address the defendant's claim that the Appellate Court's judgment may be affirmed on the alternative ground that the trial court improperly instructed the jury on the initial aggressor exception to self-defense.[16] According to the defendant, the trial court's instruction misled the jury by failing to clarify that the jury could not find that the defendant was the initial aggressor on the basis of words alone, and by suggesting that the jury could find that the defendant was the initial aggressor if it found that Harris subjectively believed that the defendant intended to use physical force against him, even if that belief was not reasonable. We agree with the state that there is no reasonable possibility that the jury was misled by the challenged instructions.[17]

The following additional facts and procedural history are relevant to this claim. The defendant timely filed a request to charge that included instructions on self-defense and the initial aggressor exception but not on the definition of initial aggressor. The state requested that the trial court instruct the jury on the initial aggressor exception consistent with the model instruction available on the Judicial Branch website.[18] During the trial court's final charge to the jury, after explaining general principles governing the use of force in self-defense, the court gave an instruction on the initial aggressor exception that was identical to the model instruction in all relevant respects. In relevant part, the trial court instructed the jury: "[T]he state can prove that the defendant was not justified in using physical force in self-defense by proving beyond a reasonable doubt that he was the initial aggressor in this encounter with . . . Harris and that he neither withdrew from that encounter nor effectively communicated his intent to do so before using physical force against . . . Har-

ris. To . . . prove that the defendant was the initial aggressor in this encounter with . . . Harris, the state need not prove that the defendant was the first person to use physical force in that encounter. The initial aggressor can be the first person who threatened to use physical force or even the first person who appeared to threaten the imminent use of physical force under [the] circumstances. . . . The defendant has no burden whatsoever to prove that he was not the initial aggressor or that he withdrew from the encounter and communicated his intent to do so before he used physical force against . . . Harris. To the contrary, you may only reject his defense on the basis of the statutory disqualification if you find that the state has proved beyond a reasonable doubt that he was the initial aggressor, did not withdraw from the encounter, and did not communicate his intent to withdraw before using physical force."

On appeal, the defendant claims that the trial court's instruction that "[t]he initial aggressor can be . . . the first person who appeared to threaten the imminent use of physical force" did not clarify that the jury could not find that the defendant was the initial aggressor on the basis of words alone. The defendant contends that the jury may have found that he was the initial aggressor on the basis of mere words because there was evidence that the defendant verbally threatened Harris on two occasions prior to the altercation that led to the assault charge. First, there was testimony from several witnesses that, when Harris ordered the defendant to leave his property several weeks before the altercation, the defendant looked at Harris and said "I'll get you." Second, when the defendant saw Harris on Kennedy Avenue prior to the assault, he displayed a knife and said, "[w]hat's up, Old School?" According to the defendant, the trial court's failure to expressly instruct the jury that it could not find that he was the initial aggressor solely on the basis of a verbal threat allowed the jury to credit his version of the events surrounding the altercation in its entirety, but the jury nevertheless found him guilty of the assault because it determined that he was the initial aggressor on the basis of these earlier verbal threats. In a similar vein, the defendant also contends that the trial court's instruction failed to convey to the jury that it could find that he was the initial aggressor only if Harris had a reasonable belief that the defendant was about to use physical force. The defendant maintains that the jury may have rejected his self-defense claim on the ground that, due to the previous encounters in which the defendant had threatened Harris, Harris subjectively believed that the defendant intended to attack him, even if that belief was not a reasonable one.

Before discussing the merits of the defendant's claims, we briefly set forth the legal principles that govern our review. "A fundamental element of due process is the right of a defendant charged with a crime

to establish a defense. . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified." (Citations omitted; internal quotation marks omitted.) *State* v. *Jimenez*, 228 Conn. 335, 339, 636 A.2d 782 (1994). Thus, "[a]n improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Singleton*, 292 Conn. 734, 745, 974 A.2d 679 (2009). "It is well established that a defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled." (Internal quotation marks omitted.) *State* v. *Fields*, 302 Conn. 236, 245, 24 A.3d 1243 (2011). In evaluating a claim of instructional impropriety, however, "we must view the court's jury instructions as a whole, without focusing unduly on one isolated aspect of the charge. . . . In determining whether a jury instruction is improper, the charge . . . is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect [on] the jury in guiding [it] to a correct verdict in the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 845, 100 A.3d 361 (2014). Finally, because a challenge to the validity of a jury instruction presents a question of law, we exercise plenary review. E.g., *State* v. *Singleton*, supra, 746.

General Statutes § 53a-19 (c) provides in relevant part that "a person is not justified in using physical force when . . . (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . ." Although the term "initial aggressor" is not defined by statute, in *State* v. *Jimenez*, supra, 228 Conn. 335, we stated that "[i]t is not the law . . . that the person who first uses physical force is necessarily the initial aggressor under § 53a-19 (c) (2)." Id., 340. Rather, "§ 53a-19 contemplates that a person may respond with physical force to a reasonably perceived threat of physical force without becoming the initial aggressor and forfeiting the defense of self-defense. Otherwise, in order to avoid being labeled the aggressor, a person would have to stand by meekly and wait until an assailant struck the first blow before responding." Id., 341. Thus, we have approved of instructions defining initial aggressor as "the person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used [on] that other person . . . ." (Internal quotation marks

omitted.) *State* v. *Singleton*, supra, 292 Conn. 763.

With respect to the nature of the conduct required to create a reasonably perceived threat of physical force, we previously have indicated that the mere use of offensive words, without more, is insufficient to qualify a defendant as the initial aggressor. See, e.g., *State* v. *Whitford*, 260 Conn. 610, 621, 799 A.2d 1034 (2002) ("the discussion of a subject as to which animus existed between the parties . . . does not by itself make . . . [one] the aggressor" [internal quotation marks omitted]), quoting *State* v. *Corchado*, 188 Conn. 653, 667 n.15, 453 A.2d 427 (1982). This is consistent with the well established principle that the use of physical force in defense of oneself is justified only if the person claiming self-defense honestly and reasonably believes that an attack is imminent. See, e.g., *State* v. *Lewis*, 220 Conn. 602, 620, 600 A.2d 1330 (1991) ("[t]he defense of self-defense does not encompass a preemptive strike"); *State* v. *Peters*, 40 Conn. App. 805, 814–15, 673 A.2d 1158 ("the defendant must entertain an honest belief that the other person is using or is about to use physical force, and the defendant's decision to use defensive force must be based on this sincere belief as opposed to anger, malice or revenge"), cert. denied, 237 Conn. 925, 677 A.2d 949 (1996).

For several reasons, we are not persuaded that there is any reasonable possibility that the trial court's instruction on the initial aggressor exception misled the jury to the detriment of the defendant's self-defense claim. First, as we recently explained in addressing the identical contention in *State* v. *Revels*, 313 Conn. 762, 785, 99 A.3d 1130 (2014), when assessing whether an instruction adequately conveyed to the jury the principles governing the initial aggressor exception, we must look to the entirety of the court's self-defense instruction. In *Revels*, we observed that, "[a]t other points in the court's instructions relating to self-defense, the court properly and thoroughly explained that in order for a defendant to claim that he has acted in self-defense, the defendant's belief that the other actor is about to use physical force must be a reasonable one." Id. We further explained that "[t]he court's definition of 'initial aggressor' must be understood therefore to incorporate the notion that only actions that *reasonably* appear to threaten the imminent use of physical force will make the defendant an initial aggressor."[19] (Emphasis in original.) Id. In the present case, the trial court repeatedly explained the principle that one cannot use physical force against another unless his subjective belief that that person is about to use physical force against him was reasonable under the circumstances. In addition, the trial court, in instructing the jury that the determination of whether the defendant acted in self-defense did not require that Harris actually intended to use physical force, but only that the defendant perceived that Harris was about to use physical

force, again explained that the defendant's perception regarding the threat of force must have been reasonable. In view of the fact that the trial court thoroughly instructed the jury regarding the subjective-objective inquiry with respect to the use of force in self-defense, the court's instruction that the initial aggressor may be "the first person who appeared to threaten the imminent use of physical force" must be understood to have incorporated the reasonableness requirement.

Moreover, contrary to the defendant's contention, the jury could not have credited his testimony regarding the altercation and still have found him guilty of the assault. As the state observes, the trial court instructed the jury that it should consider self-defense only if it first determined that the state had "prove[n] beyond a reasonable doubt each element of [the] crime . . . . If you find that the . . . state has been able to prove beyond a reasonable doubt each and every element necessary, you then move onto the issue of self-defense." With respect to the elements of assault in the second degree; see General Statutes § 53a-60 (a) (2); the trial court instructed the jury that, in order to find the defendant guilty of that crime, it had to find that he "had the specific intent to cause physical injury to . . . Harris, [that he] did cause physical injury to . . . Harris, and [that he] caused the injury by means of a dangerous instrument . . . ." Thus, before the jury considered whether the state proved that the defendant had not acted in self-defense, it first must have found that he intentionally caused physical injury to Harris with the knife.

Only Harris' testimony, however, provided the jury with an account by which it reasonably could have found that the defendant intentionally caused physical injury to Harris. As we previously indicated, Harris testified that, when he saw the defendant on Beaver Street, he got off his bicycle and approached him to ask "what the problem was." Harris further testified that the defendant immediately started swinging the knife "like a wild man" and that, as he ran away, the defendant pursued him and cut him across the lower back.[20] Finally, Harris testified that he knocked the defendant down by riding his bicycle into him and that the defendant continued to slash at him with the knife until Harris was able to subdue him.

The defendant, in stark contrast, testified that he did not intentionally cut or stab Harris with the knife. He explained, rather, that, after Harris knocked him down with the bicycle, the defendant removed the knife from his pocket only to discourage Harris from attacking him, and that he must have accidentally cut Harris during the ensuing scuffle. This testimony, therefore, would not have supported a finding that the defendant intentionally caused physical injury to Harris, as required under § 53a-60 (a) (2). Thus, if the jury had credited the defen-

dant's testimony, it could not have found that he was the initial aggressor because the jury would not have reached his self-defense claim in the first instance.

Finally, because Harris' testimony provided the only factual basis for the jury's verdict, we must presume that the jury credited that testimony with respect to the assault.[21] In view of Harris' testimony that the defendant intentionally assaulted him after chasing him and swinging the knife in his direction almost immediately after they encountered each other on Beaver Street, there is no reasonable possibility that the defendant was prejudiced by the fact that the jury was not instructed that words alone cannot support an initial aggressor finding.

Finally, nothing in the state's closing argument suggested to the jury that it could find that the defendant was the initial aggressor on the basis of his previous verbal threats, and, in fact, neither party referred to the initial aggressor principle at any time during their respective closing arguments. See *State* v. *Singleton*, supra, 292 Conn. 763–64 (court did not improperly fail to instruct jury that person cannot be initial aggressor on basis of words alone when neither state nor defendant indicated during closing argument that it could find defendant was initial aggressor on that basis). In addressing the jury during his initial closing argument, the prosecutor attempted to counter the defendant's testimony that he accidentally cut Harris during the scuffle. The prosecutor referred to the previous incident at Harrison's property several weeks prior to the assault and argued that "[t]his wasn't somebody who made a mistake. [The defendant] wanted to hurt . . . Harris" because he was angry about their previous encounter. The prosecutor then argued that the defendant's claim that he accidentally cut Harris during the struggle did not make sense, noting that the defendant's testimony suggested that "[t]he cut on [Harris'] back [occurred] somehow while . . . Harris is holding [the defendant's] hands" and that "[t]he cut across the chest is, apparently, self-inflicted by . . . Harris holding [the defendant's] hands and, apparently, ripping the knife clean across him with [the defendant] holding the knife. . . . You're not [going to] do that to yourself; you can't do that to yourself. There had to be some force behind that, such as a swing and a slash, not [an] impalement as [the defendant] would like to describe it."

For his part, defense counsel argued to the jury that the defendant displayed the knife in an effort to ward off Harris' attack because the defendant "felt . . . that he was being overpowered" and that he accidentally cut Harris during the struggle. Defense counsel argued that, after the defendant displayed the knife, Harris "lunge[d] at [the defendant] and [grabbed the defendant] by both hands . . . so [the defendant did] not have any control over his own hands." Counsel maintained that the evidence regarding Harris' injuries, as

well as Harris' lack of defensive wounds, supported the defendant's claim that he cut Harris accidentally during the struggle, explaining that "[i]t's all very plausible how these injuries have occurred. Harris [did not] know . . . that he was hit; [the defendant did not] know that he cut him." In rebuttal closing argument, the prosecutor did not assert that the defendant was the initial aggressor because he previously had threatened Harris. Rather, the prosecutor focused exclusively on the physical altercation in attempting to rebut the defendant's testimony that he was too intoxicated to flee or to defend himself without the knife.

Thus, although the defendant is correct in the abstract that, as a matter of law, the jury could not have determined that he was the initial aggressor solely on the basis of his utterance of certain words or solely on the basis of Harris' subjective fear that the defendant was intent on attacking him, we previously have recognized that "[t]he mere fact that the defendant properly cites to a proposition of law related to the claim of self-defense . . . does not entitle him to an instruction thereon." *State* v. *Whitford*, supra, 260 Conn. 621–22. Rather, "[a]s long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 809, 91 A.3d 384 (2014). In the present case, it is apparent that the jury rejected the only testimony from which it reasonably could have found that the defendant was the initial aggressor predicated solely on his previous verbal threats or on Harris' subjective but unreasonable belief that the defendant intended to use physical force against him as evidenced by those threats. Rather, as we discussed previously, Harris' testimony regarding the assault—which is the only version of the incident that supports the jury's verdict on that charge—establishes that the defendant charged at Harris while the defendant was swinging the knife in Harris' direction almost as soon as Harris approached the defendant on Beaver Street. In such circumstances, where the jury credited Harris' testimony characterizing the defendant's attack against him as wholly unprovoked, there is no reasonable possibility that the jury found that the defendant was the initial aggressor on the basis of the verbal threats he made during their previous encounters. Accordingly, there also is no reasonable possibility that the jury was misled by the challenged instruction.

### B

### Motion to Suppress

The defendant next challenges the Appellate Court's conclusion that the trial court properly denied his motion to suppress evidence of the knife that he used during the assault. The defendant claims that the seizure of the knife violated the fourth amendment to the United

States constitution.[22] We are not persuaded.

The following facts and procedural history are relevant to this claim. At the hearing on the defendant's motion to suppress, Officer Reo testified that he and Officer Williams responded to reports of criminal activity in the area of Beaver Street and Rose Street in Danbury at approximately 7:30 p.m. on the night in question. Upon arriving at the scene, the officers encountered the defendant in the street, and the defendant reported, inter alia, that another man had taken money from him. The defendant also provided a description of the alleged perpetrator. The officers canvassed the area and detained several potential suspects, but the defendant did not identify any of them as the perpetrator. The defendant then asked the officers for a ride home, and Reo accommodated the defendant's request because, at that point in time, he considered the defendant to be a victim, and he did not want the defendant, who appeared to be intoxicated, to walk home. Reo informed the defendant that, in accordance with Danbury Police Department procedure, he would have to be patted down before entering the police car to ensure that he did not have any weapons on him. The defendant then informed Reo that he had a knife in his pocket, and he voluntarily handed it to Reo, who placed it in the glove compartment of his police car. Reo testified that, when they arrived at the defendant's home, he was uncomfortable giving the knife back to the defendant due to the fact that he was intoxicated. Reo therefore told the defendant that he would hold the knife for safekeeping and that the defendant could retrieve it at police headquarters when he was sober.

Shortly after dropping the defendant off at his home, Reo heard a broadcast over the police radio system indicating that the defendant had been involved in an assault in the area of Beaver Street and Rose Street, and that a knife had been used in the assault. Reo, along with several other officers, returned to the defendant's home and took him into custody. At that point, Reo considered the knife to be evidence of the assault and, upon returning to headquarters, processed the knife as evidence. Reo testified that, according to police records, the knife was logged into evidence at 11:20 p.m. that evening.

Prior to trial, the defendant filed a motion to suppress the knife as the product of an unreasonable, and therefore unconstitutional, seizure. The defense conceded that Reo properly seized the knife before allowing him to enter the police cruiser and that Reo properly retained the knife for safekeeping when he dropped the defendant off at his home. The defense maintained, however, that, once the police considered the knife to be evidence of the assault, they were required to obtain a warrant before retaining the knife as evidence, and that the failure to do so rendered the seizure unreason-

able. The trial court denied the motion to suppress, concluding that Reo properly seized the knife before allowing the defendant into the police cruiser because "the police had an interest in protecting their well-being" while giving the defendant a ride home, the defendant consented to the seizure by voluntarily handing the knife over, and "the scope of that consent was not abused or exceeded . . . ." On appeal following the defendant's conviction, the Appellate Court rejected the defendant's claim of a constitutional violation, concluding that "[t]he [trial] court found that the defendant consented and handed the knife over voluntarily, and that the police did not exceed the scope of that consent," and, further, that "[t]he record supports this finding, which is not clearly erroneous." *State* v. *Jones*, supra, 139 Conn. App. 486.

On appeal to this court, the defendant challenges the Appellate Court's determination that the trial court properly denied his motion to suppress on the ground that he consented to the continued retention of the knife by the police. Specifically, the defendant contends that the safekeeping rationale for maintaining temporary possession of the knife did not justify its continued, warrantless retention by the police for use as evidence against him in his criminal case. According to the defendant, the initial justification for the seizure expired when the police decided to retain the knife for an investigatory or evidentiary purpose, and, because no exception to the warrant requirement is applicable under the facts presented, the retention of the knife as evidence constituted an unreasonable seizure in violation of the fourth amendment, thereby requiring its suppression. The state argues that the seizure was reasonable because the knife was lawfully in the possession of the police at the time they obtained probable cause to believe that it was used in the assault. Although we agree with the defendant that the initial temporary seizure of the knife for safety reasons did not alone justify its further retention for evidentiary purposes, we also conclude that such retention was reasonable because the police had probable cause to believe that the defendant used the knife in the commission of the assault.

The following well settled legal principles govern our review of the defendant's claim. "[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine

whether they are legally and logically correct and whether they find support in the facts [found by the trial court] . . . .” (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 394, 40 A.3d 290 (2012).

“The fourth amendment to the United States constitution, made applicable to the states through the [due process clause of the] fourteenth amendment, prohibits unreasonable searches and seizures by government agents.” *State* v. *Eady*, 249 Conn. 431, 436, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999). “A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property. . . . If a seizure has occurred, then the court must engage in a complex inquiry to determine whether that seizure was reasonable. . . .

“With regard to the reasonableness requirement, [i]n the ordinary case, the [United States Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the [f]ourth [a]mendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized. . . . The . . . [c]ourt has nonetheless made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [c]ourt has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.” (Citations omitted; internal quotation marks omitted.) *Fleming* v. *Bridgeport*, 284 Conn. 502, 520–21, 935 A.2d 126 (2007).

As we discussed previously, the defendant contends that, although the initial temporary seizure of the knife for safekeeping was reasonable, and therefore lawful, the seizure became unreasonable for fourth amendment purposes when the police thereafter retained the knife as evidence of the assault without obtaining a warrant. Although implicitly acknowledging that the defendant's consent did not extend beyond the next morning, at which time the defendant presumably had become sober,[23] the state argues that the seizure was reasonable because the police had probable cause to believe that the knife was used in the assault. Thus, we must decide whether the police, having lawfully seized personal property without a warrant on a temporary basis for a noninvestigatory purpose and having subsequently developed, while the item was still in their possession, probable cause to believe that it is evidence of a crime, are required to obtain a warrant if they wish to retain the item as evidence.

As the parties acknowledge, there is little case law addressing the issue of whether it is reasonable for police to extend a temporary, warrantless seizure of personal property on the basis of a justification that

differs from that on which the initial seizure was founded. In other contexts, however, the United States Supreme Court has recognized "the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Texas* v. *Brown*, 460 U.S. 730, 739, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (opinion announcing judgment). As the state observes, one context in which this general rule applies is the plain view exception to the warrant requirement, which recognizes that, "under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge* v. *New Hampshire*, 403 U.S. 443, 465, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (plurality opinion). Under the plain view exception, "[t]he warrantless seizure of contraband that is in plain view is reasonable under the fourth amendment if two requirements are met: (1) the initial intrusion that enabled the police to view the items seized must have been lawful; and (2) the police must have had probable cause to believe that these items were contraband or stolen goods." (Internal quotation marks omitted.) *State* v. *Eady*, supra, 249 Conn. 437.

Although the plain view exception generally arises when the police inadvertently discover contraband during the course of a lawful search, the United States Supreme Court has indicated that the nature of the activity that leads to the discovery of the item is constitutionally insignificant, as long as the police involvement in that activity itself satisfies the requirements of the fourth amendment. Thus, "plain view provides grounds for seizure of an item when an officer's access to an object has *some prior justification under the* [*f*]*ourth* [*a*]*mendment*. Plain view is perhaps better understood, therefore, not as an independent exception to the [w]arrant [c]lause, but simply as an extension of *whatever the prior justification for an officer's access to an object may be*." (Emphasis added; footnote omitted; internal quotation marks omitted.) *Texas* v. *Brown*, supra, 460 U.S. 738–39 (opinion announcing judgment). "The principle is grounded on the recognition that when a police officer has observed an object in plain view, the owner's remaining interests in the object are merely those of possession and ownership . . . ." (Citation omitted; internal quotation marks omitted.) Id., 739 (opinion announcing judgment). In other words, if police have lawful access to an item that they reasonably believe constitutes evidence of criminal activity, and, in light of the circumstances presented, the defendant has no reasonable expectation of privacy in the item, the police may seize it without obtaining a warrant. See, e.g., *United States* v. *Jacobsen*, 466 U.S. 109, 121–22, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) ("it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant").

Relying on this principle, courts have concluded that

the warrantless seizure of personal property founded on probable cause was reasonable in a variety of circumstances in which the police had lawful access to the property in question. For example, "it is . . . well settled that objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton* v. *New York*, 445 U.S. 573, 586–87, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Courts also have upheld warrantless seizures predicated on probable cause when evidence is observed during the course of a routine traffic stop; see, e.g., *Texas* v. *Brown*, supra, 460 U.S. 739–44 (opinion announcing judgment) (warrantless seizure of balloon containing heroin during routine driver's license check was deemed to be lawful because officer had probable cause to believe balloon contained narcotics); *United States* v. *Spoerke*, 568 F.3d 1236, 1249 (11th Cir. 2009) (warrantless seizure of homemade explosive devices from car during traffic stop was lawful because devices were in plain view); when government agents inspect the contents of a package following a search by employees of a private common carrier; *United States* v. *Jacobsen*, supra, 466 U.S. 120–22 (warrant was not necessary to seize contents of package searched by employees of private common carrier because federal agents had probable cause to believe package contained narcotics); and when a law enforcement officer engages in legitimate questioning during a *Terry*[24] stop. See, e.g., *United States* v. *Jones*, 187 F.3d 210, 219–21 (1st Cir. 1999) (warrantless seizure of counterfeit currency discovered during *Terry* stop after suspect removed it from pocket was justified because seizure was based on probable cause).

Contrary to the defendant's contention, this principle is no less applicable when the initial intrusion pursuant to which the police gained access to the contraband in question is not investigatory in nature. For example, this court previously has concluded that "evidence of crimes . . . when observed in plain view by fire officials who are lawfully present on the premises, also may be seized without a warrant." *State* v. *Eady*, supra, 249 Conn. 438; see also *United States* v. *Green*, 474 F.2d 1385, 1389–90 (5th Cir.), cert. denied, 414 U.S. 829, 94 S. Ct. 55, 38 L. Ed. 2d 63 (1973). Similarly, police may seize contraband that they observe while acting pursuant to their community caretaking function or while rendering aid to a person in distress. See, e.g., *United States* v. *Johnson*, 410 F.3d 137, 141–42, 144–45 (4th Cir.) (seizure of gun was upheld when officer acting pursuant to community caretaking function found gun while searching glove compartment for identification after finding defendant unresponsive in vehicle), cert. denied, 546 U.S. 952, 126 S. Ct. 461, 163 L. Ed. 2d 250

(2005); *State* v. *Kuskowski*, 200 Conn. 82, 84–85, 510 A.2d 172 (1986) (police officer properly seized narcotics in plain view after observing them while assisting defendant who was passed out in vehicle with propane torch burning in his lap).

In *State* v. *Lane*, 328 N.C. 598, 403 S.E.2d 267, cert. denied, 502 U.S. 915, 112 S. Ct. 319, 116 L. Ed. 2d 261 (1991), the Supreme Court of North Carolina applied this principle in a factual context similar to the present case. In *Lane*, the police responded to a report of a suicide threat and found the defendant, Albert Lee Lane, armed with a pistol. Id., 603. The police spoke with Lane, who voluntarily gave the pistol and its ammunition to the police. Id., 603, 611. While the police still had possession of the pistol, they obtained probable cause to believe that Lane was involved in a murder and that the pistol was the murder weapon. See id., 611. Lane sought to suppress the pistol and ammunition, contending that, although he consented to the initial seizure when the police responded to the report of a suicide threat, the seizure became unreasonable when the police retained the pistol and ammunition as evidence of the murder. See id., 610–11. On appeal, the Supreme Court of North Carolina upheld the trial court's decision not to suppress the pistol and ammunition, concluding that, "since the pistol and ammunition were already lawfully in the possession of the police officer, he was not required to return [them] to the owner [because there was] probable cause to retain [them]." Id., 611; see also 4 W. LaFave, Search and Seizure (5th Ed. 2012) § 8.1 (c), pp. 58–61 ("a consent to a seizure can be withdrawn by requesting return of the seized article, *which however need not be complied with if there is then probable cause to retain it as evidence*" [emphasis added; footnote omitted]).

As the foregoing demonstrates, when police have lawful access to an item for which they have probable cause to believe is evidence of a crime, it is not unreasonable for them to seize that item without a warrant, and this principle applies equally when the police have access to the item in question due to an antecedent seizure rather than a search.[25] As we discussed previously, there is no dispute, for purposes of this appeal, that Reo lawfully had the knife in his possession when he heard the broadcast indicating that the defendant was wanted in connection with the assault. The question, then, is whether Reo had probable cause to justify retaining the knife as evidence.[26]

"Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . In other words, because [t]he probable cause determination is, simply, an analysis of probabilities . . . [p]robable cause requires only a probability or substan-

tial chance of criminal activity, not an actual showing of such activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Shields*, 308 Conn. 678, 690, 69 A.3d 293 (2013), cert. denied,     U.S.    , 134 S. Ct. 1040, 188 L. Ed. 2d 123 (2014). On the basis of Reo's testimony at the hearing on the defendant's motion to suppress, it is evident that the facts were more than sufficient to lead a reasonable person to believe that the knife was evidence of a crime. When Reo responded to the area of Beaver Street and Rose Street, he found that the defendant was "irritated" and "appeared to be intoxicated . . . ." The defendant eventually asked for a ride home, at which time the defendant informed Reo that he had a knife in his pocket, which he voluntarily handed to Reo. After dropping the defendant off at his home, Reo heard a broadcast over the police radio system indicating that the defendant was wanted for an assault with a knife in the area of Beaver Street and Rose Street, the same location at which Reo originally encountered the defendant. At that time, Reo had sufficient information to believe that the knife was used in the assault, and he was justified in retaining the knife as evidence. Accordingly, the trial court properly denied the defendant's motion to suppress.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion ROGERS, C. J., and ZARELLA, ESPINOSA and ROBINSON, Js., concurred.

[1] The defendant apparently used a box cutter containing a razor blade. In the interest of simplicity, we refer to the box cutter as a knife.

[2] In *Williams*, we identified the following six factors that courts should consider in determining whether prosecutorial impropriety deprived a defendant of a fair trial: (1) the extent to which the impropriety was invited by defense conduct or argument; (2) the severity of the impropriety; (3) the frequency of the impropriety; (4) the centrality of the impropriety to the critical issues in the case; (5) whether any curative measures were taken by the trial court; and (6) the strength of the state's case. *State* v. *Williams*, supra, 204 Conn. 540.

[3] We granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly determine that the prosecutor's improprieties during cross-examination and final argument violated the defendant's due process rights?" *State* v. *Jones*, 307 Conn. 957, 59 A.3d 1192 (2013).

We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly affirm the trial court's denial of the defendant's motion to suppress?" *State* v. *Jones*, 307 Conn. 958, 59 A.3d 1192 (2013).

After we granted the parties' petitions for certification to appeal, the defendant filed a preliminary statement of the issues pursuant to Practice Book § 63-4 (a) (1), expressing his intention to present a claim, as an alternative ground for affirmance, that the trial court improperly had instructed the jury on the initial aggressor exception to self-defense.

[4] The dissent asserts that the defendant has established that the improprieties at issue in the present case violated his "right to testify and present a defense," in violation of the fifth, sixth and fourteenth amendments to the United States constitution, and, as a consequence, the state bears the burden of establishing that the improprieties were harmless beyond a reasonable doubt. See, e.g., *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012) (explaining that, when improper remarks by prosecutor implicate defendant's due process rights, defendant must prove that remarks were both improper *and* harmful, but that, upon showing by defendant that prosecu-

tor's improper remarks violate specifically enumerated constitutional right, such as defendant's right to remain silent or to present defense, burden falls on state to establish harmlessness beyond reasonable doubt). In support of this assertion, the dissent explains that the improprieties in the present case so "weaken[ed]" the defendant's credibility as to constitute an unconstitutional "impinge[ment]" on his right to testify in his own defense. The dissent, however, cites no case law or other support for this conclusory assertion, and, to our knowledge, no court ever has concluded that a violation of *Singh* infringes impermissibly on an accused's constitutional right to testify. Because the sole issue we must decide is whether the improprieties amounted to a deprivation of due process, the defendant bears the burden of establishing that they were so serious as to render his trial fundamentally unfair.

[5] Specifically, the trial court instructed the jury at the commencement of trial as follows: "Now, your function as the jury is to determine the facts. You are the sole and exclusive judges of the facts, and you alone determine the weight and effect, the value of the evidence, as well as the credibility of the witnesses. You must weigh the testimony of all witnesses who appear before you, and you alone are to determine whether to believe any witness and the extent to which any witness should be believed.

* * *

"Now, police officers will testify in this case. You must determine the credibility of police officers in the same way as you would any other witness[es], and testimony of a police officer is entitled to no special or exclusive weight merely because it comes from a police official. You should recall his or her demeanor on the stand, the manner of testifying, and weigh and balance it just as carefully as you would the testimony of any other witness. You should neither believe nor disbelieve the testimony of a police official simply because he or she is, in fact, a police officer."

At the conclusion of the trial, the trial court reiterated the role of the jury in assessing the credibility of police officers, stating: "You are entitled to . . . accept any testimony which you believe to be true and to reject, either wholly or in part, the testimony of any witness you believe has testified untruthfully or erroneously. The credit that you will give to the testimony offered is, as I have told you, something which you alone must determine.

* * *

"As you will recall, there was testimony here from police officers. The testimony of a police officer is entitled to no special [or] exclusive credibility merely because it comes from a police officer. A police officer who takes the witness stand subjects his testimony to the same tests that any other witness does. You should not automatically believe or disbelieve them merely because they are police officers. . . . You should weigh their testimony just as you would that of any other witness[es]."

[6] The prosecutor cross-examined the defendant as follows:

"Q. . . . [I]t's your testimony that you didn't have any marijuana?

"A. No, sir, I did not have any marijuana.

"Q. So, what Officer Georgoulis testified to today is all false?

"A. Yes, sir."

[7] During closing argument, the prosecutor stated as follows: "I ask you to . . . look at the way these witnesses testified; think about whether or not any of them have reasons to alter their testimony or falsely testify before the court. The officers have nothing to gain. . . . Harris is not go[ing] [to] gain anything. He's not trying to avoid any kind of criminal charges; none [was] ever filed because the police found there weren't any to be charged . . . . What we do have is [the defendant], who has every reason in the world not to want to agree with . . . the correct factual scenario. . . . So, he started concocting his version of the events, and his version became a robbery where he's the victim . . . .

"[The defendant], before he was able to create this story, even told Officer Reo, 'I was in the area to buy marijuana.' Ooh, now that's a bad statement when, two hours later, the police are arresting him, and, all of a sudden, he's got a bag of marijuana in his pocket. . . . Things are unraveling; one story won't work now. So, what's the answer; the answer is, I never said that; the police are lying apparently.

"[The defendant] then has to explain, hmmm, how I'm gonna, you know, how I'm gonna say I couldn't just turn around and run away from . . . Harris, who was coming after me."

[8] We note that the dissent, in reaching a contrary determination, adopts the conclusion of the Appellate Court that three of the four *Singh* violations were especially harmful because, in those instances, "the defendant was

compelled to comment directly on the veracity of police witnesses"; *State* v. *Jones*, supra, 139 Conn. App. 478; and "[the] risk [that *Singh* violations pose] is especially acute when the witness is a government agent in a criminal case. . . . Indeed, Connecticut courts routinely instruct juries that they should evaluate the credibility of a police officer in the same way that they evaluate the testimony of any other witness . . . no doubt to check the heightened credibility that government agents are afforded by some jurors." (Citation omitted; internal quotation marks omitted.) Id. As the state maintains, however, the Appellate Court failed to distinguish between the assault and the drug charges and, as a result, failed to consider what, if any, prejudicial effect the improprieties relating to the drug charge had on the assault charge, as it was required to do in assessing harmfulness. Indeed, neither the Appellate Court nor the dissent offers an explanation as to why *Singh*'s concern regarding the heightened credibility that jurors may afford police officers bears any relevance at all in a case, like the present one, in which the police provided no material testimony with respect to the charge of which the defendant was convicted.

[9] The dissent asserts that we are "missing the point" in concluding that the *Singh* violations were necessarily harmless insofar as they related to the police testimony because the *purpose* of that improper questioning was to undermine the defendant's credibility generally. Whatever the intent of the prosecutor, however, the issue that we must address is whether that questioning was, in fact, harmful. The questioning pertaining to the police testimony was demonstrably *not* harmful because, as we have explained, the jury verdict of not guilty on the drug charge reflects the fact that, the *Singh* violations notwithstanding, the jury refused to credit the testimony of the police officers over that of the defendant. In such circumstances, the *potential* for harm that a *Singh* violation creates simply is not realized.

[10] The following is the relevant portion of the prosecutor's cross-examination of the defendant:

"Q. . . . [D]id . . . Harris ask you for change so that he could get narcotics?

"A. Yes, he did.

"Q. This is after you told him to 'F' off in front of the grocery store earlier that night?

"A. Yes, it is.

"Q. Now, all this testimony from . . . Harris then about the bus stop; that was a lie?

"A. Yes, it was.

"Q. And, all the police officers' testimony is a lie?

"A. I didn't say that. What part of their testimony?

"Q. The part of the testimony that contradicts everything about a robbery. . . . [I]sn't it true that your whole story is made up to fit the fact that you were caught by the police before you could get away from the scene?

\* \* \*

"A. No, that's not true."

[11] Indeed, a review of the record suggests that the prosecutor may have misspoken or been momentarily confused when he posed the question. The defendant obviously was confused by the question because he asked what the prosecutor was talking about and flatly denied ever having said or suggested that the officers had lied about the larceny.

[12] Of course, we do not foreclose the possibility that, in a particular case, *Singh* violations alone would result in sufficient prejudice to the defendant to warrant a new trial.

[13] Thus, the *Singh* violations pertained to a central issue in the case. In addition, there is nothing in the record to suggest that those violations were invited by defense counsel.

[14] The dissent indicates that we have failed to consider the cumulative effect of the *Singh* violations in evaluating whether the defendant was harmed by those violations. We have done no such thing. If we appear to have "parse[d] [the] improprieties by the charge," as the dissent alleges, it is only because we are *required* to consider the effect of the *Singh* violations on the individual charges; see *State* v. *Spencer*, supra, 275 Conn. 182; and because the present case presents the unusual scenario in which the jury found the defendant not guilty of the charge that was associated with the most serious *Singh* violations, a fact that we must accord significant weight in evaluating whether the improprieties as a whole deprived the defendant of a fair trial.

We note, moreover, that "are they lying" questions are prohibited not because they are so inherently prejudicial as to *always* require a new trial; they are barred, rather, to reduce the risk of the occurrence of specific

harms, such as dilution of the state's burden of proof. See, e.g., *State* v. *Singh*, supra, 259 Conn. 707–10 (identifying risks attendant to asking witness to comment on veracity of other witnesses). Rather than explain why we are mistaken in our conclusion that, for reasons unique to the present case, none of those harms is implicated, the dissent appears to take the position that simply asking a defendant whether another witness has lied always will be harmful in a case that pits the defendant's testimony against that of another witness, even if the witness on whose veracity the defendant is asked to opine provided no material testimony in the case. For example, the dissent states that, "if we consider these questions improper and have clearly stated that prohibition so that prosecutors, who are officers of the court, know that they are improper, we must hold such officers of the court accountable," and that, "on three separate occasions, the prosecutor deliberately violated *Singh* by explicitly asking the defendant to comment on the veracity of other witnesses . . . ." In taking such a position, the dissent misapplies *Singh* by improperly conflating the issue of whether an impropriety occurred with the separate and distinct issue of whether that impropriety deprived the defendant of a fair trial. Furthermore, in seeking to hold the prosecutor accountable for the *Singh* violations by reversing the judgment of conviction, the dissent contravenes the well established rule that "[t]he fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial [impropriety]." (Internal quotation marks omitted.) *State* v. *Paul B.*, 315 Conn. 19, 36, 105 A.3d 130 (2014).

Finally, the dissent asserts that we have "essentially overrule[d]" *Singh* in light of our determination that any possible prejudice that might inure to a defendant by virtue of a *Singh* violation is minimal when, as in the present case, either the defendant or the witness on whose credibility the defendant has been asked to comment is, in fact, lying. On the contrary, we expressly reaffirm *Singh*'s prohibition against "are they lying" questions. We simply conclude that, under the circumstances of this case, in which the defendant's sole claim with respect to the assault charge was that Harris was untruthful, asking the defendant directly whether the victim was lying, although improper, gave rise to no material harm.

[15] The defendant raises several additional claims of prosecutorial impropriety that the Appellate Court declined to address; see *State* v. *Jones*, supra, 139 Conn. App. 477; none of which is persuasive. For example, the defendant contends that it was improper for the prosecutor to argue that, when the police arrived on the scene, the defendant had to concoct a story about a robbery in order to divert suspicion away from him. The defendant also contends that it was improper for the prosecutor to argue that the state's witnesses had nothing to gain from testifying untruthfully whereas the defendant had everything to gain from doing so. As we previously have explained, however, "in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and thus to argue, that one of the two sides is lying." (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 52. As we also have stated previously, it is not improper for a prosecutor to argue that the victim and the police had no reason to lie whereas the defendant did when, as in the present case, the argument merely underscores an inference that the jury readily could have drawn entirely on its own. See *State* v. *Stevenson*, 269 Conn. 563, 584–86, 849 A.2d 626 (2004). The defendant further argues that the prosecutor was unnecessarily sarcastic and "made veiled assertions against [the defendant's] character" by arguing, among other things, that the defendant, by his own admission, frequents an area "known for drug activity" with "large sums of money" just to "hang out" and "apparently, is a very nice person who is willing to make change for people in a drug area . . . . He's even so trusting as to be willing to hand that person the money while he looks for the rest of the change . . . ." Although this court neither encourages nor condones the use of sarcasm because its needless or excessive use may improperly influence the jury; see, e.g., *State* v. *Salamon*, 287 Conn. 509, 564, 949 A.2d 1092 (2008); we do not believe that the remarks at issue exceeded the bounds of fair argument. We conclude, rather, that the prosecutor simply was urging the jury to draw an inference supported by the evidence, namely, that the defendant's account of the circumstances surrounding the assault was manifestly unbelievable. Cf. *State* v. *Stevenson*, supra, 584 (prosecutor's remark during closing argument describing defendant's explanation as " 'totally unbelievable' " was "a comment on the evidence presented at trial, and it posited a reasonable inference that the jury itself could have drawn").

Finally, the defendant contends that, on several occasions, the prosecutor argued facts that were not in evidence. For example, the defendant claims that the prosecutor improperly argued: "If [Harris is] a drug user, wouldn't

he know where to get the drugs from? Would he walk up to somebody, a stranger such as [the defendant], and say, hey, can I buy crack cocaine? We know . . . Harris is not a drug user. He did in high school, and he admitted that to everybody right there on the stand, yep, high school; [he] tried marijuana. But . . . Harris also has proof that he hasn't been using marijuana or any other drug since then. Thirty-one years with Kimberly-Clark [Corporation], which has a drug policy testing program; he's clear." We reject this claim because the prosecutor's argument was adequately rooted in the evidence. Although it is true, as the defendant asserts, that the state presented no direct proof, apart from Harris' own testimony, that Harris had not used drugs in more than thirty years, it is clear that the "proof" to which the prosecutor referred was, in fact, Harris' testimony concerning his former employer's mandatory drug testing policy, which Harris had cited as the reason he did not use drugs. If the jurors had credited this testimony, as they were free to do, they reasonably could have found that Harris was not a drug user and that the defendant's assertions to the contrary were false.

[16] The Appellate Court did not address this claim because it concluded that the defendant was entitled to a new trial on the basis of his prosecutorial impropriety claims. See *State* v. *Jones*, supra, 139 Conn. App. 471 n.2. After we granted the state's petition for certification, the defendant filed a statement pursuant to Practice Book § 63-4 (a) (1) indicating that he intended to present his instructional claim as an alternative ground for affirmance.

[17] The defendant contends that he preserved this claim for appellate review by virtue of the jury instructions that the defense requested in the trial court, and the state does not contest this assertion.

[18] See Connecticut Criminal Jury Instructions § 2.8-2 (B), available at https://www.jud.ct.gov/JI/criminal/part2/2.8-2.htm#B (last visited December 4, 2015).

[19] We recognize that, because the defendant in *Revels* claimed that the trial court's instruction was plain error; *State* v. *Revels*, supra, 313 Conn. 782–83; this court's review of his claim arguably was more limited than our review under the plenary standard that applies in the present case. See id., 783–84. We nevertheless rely on our reasoning in *Revels* because our analysis therein with respect to the issue of whether the trial court's instruction misled the jury is no less applicable to our consideration of the instructions in the present case.

[20] We disagree with the defendant's contention that Harris' testimony was equivocal on this point. As the state observes, Harris clearly and unequivocally testified that the defendant started attacking him almost immediately after he approached him on Beaver Street.

[21] As we explained previously; see part I of this opinion; the defendant's testimony concerning his altercation with Harris was diametrically opposed to Harris' testimony about that encounter. Consequently, the jury was required to decide which one was telling the truth and which one was not, and the jury obviously credited the testimony of Harris over that of the defendant. Although it is theoretically possible that the jury did not credit all of Harris' testimony with respect to the precise manner in which the assault occurred, there is nothing in the record to suggest that the jury did not credit his testimony in all material respects.

[22] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The defendant also makes a claim under article first, § 7, of the Connecticut constitution. He does not contend, however, that article first, § 7, provides broader protection than the fourth amendment under the circumstances presented, and, in fact, he has not separately briefed and analyzed his state constitutional claim. Accordingly, we address the defendant's federal constitutional claim only. See, e.g., *In re Kevin K.*, 299 Conn. 107, 126 n.11, 7 A.3d 898 (2010) (deeming state constitutional claim abandoned because it was not separately briefed and analyzed).

[23] In doing so, the state also implicitly acknowledges that the trial court and the Appellate Court incorrectly concluded that the police did not exceed the scope of the defendant's initial consent when, without obtaining a warrant, they retained the knife as evidence in connection with his assault against Harris. We agree with the state that the defendant's consent to temporarily turning over the knife to the police for safekeeping does not

extend to the state's retention of the knife for use as evidence against him.

[24] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In *Terry*, the United States Supreme Court concluded that police officers may briefly detain an individual if they have reasonable and articulable suspicion to believe that he is involved in criminal activity. See id., 22.

[25] In support of his contrary contention, the defendant relies on cases in which courts have indicated that a warrant is required when the subsequent search or seizure involves a greater intrusion on the defendant's privacy interests. See, e.g., *Reedy* v. *Evanson*, 615 F.3d 197, 227–30 (3d Cir. 2010) (plaintiff agreed to have her blood tested "for the purpose of evaluating the extent of her injuries and risk of disease from a sexual assault, and for the purpose of gathering physical evidence to prosecute her assailant," but police violated her fourth amendment rights by conducting additional drug testing for investigative purposes because that testing fell outside scope of her consent, and plaintiff "indisputably had a reasonable expectation of privacy in her blood when it was drawn, and she did nothing to forfeit that expectation"), cert. denied, 562 U.S. 1256, 131 S. Ct. 1571, 179 L. Ed. 2d 474 (2011); cf. *State* v. *Jackson*, supra, 304 Conn. 404 (New Haven police obtained defendant's clothing from New York City police and subjected it to DNA testing, but no fourth amendment violation occurred because "the mere transfer of the defendant's lawfully seized clothes . . . did not result in any greater intrusion into the defendant's privacy than had occurred during the initial lawful seizure, and the New Haven police obtained a search warrant before they subjected the clothes to forensic testing"). In the present case, the mere retention of the knife involved no further intrusion into the defendant's privacy interests than did the initial seizure, and no forensic testing was conducted on the knife that would have brought this case within the ambit of the cases on which the defendant relies.

[26] Although the trial court did not address the issue of whether the police had probable cause, we may do so on appeal because whether a set of facts is sufficient to satisfy the probable cause standard is subject to plenary review; e.g., *State* v. *Johnson*, 286 Conn. 427, 433, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008); and the record of the motion to suppress contains undisputed facts sufficient for our consideration of that issue. Cf. *State* v. *Torres*, 230 Conn. 372, 379, 380, 645 A.2d 529 (1994) (addressing unpreserved claim that police lacked reasonable suspicion to justify canine sniff of automobile because "the question of whether reasonable and articulable suspicion arises from an underlying set of facts is a legal conclusion that, if made by a trial court, is subject to plenary review," and "the record contain[ed] undisputed facts sufficient to [address that claim]"). We further note that, for present purposes, the defendant does not contend that the record is inadequate for our resolution of this issue.